STATE of Wisconsin, Plaintiff-Respondent,

v.

Christopher W. NEUMANN, Defendant-Appellant.†

Court of Appeals

*No. 92–2844–CR. Oral argument August 5, 1993.—Decided October 26, 1993.*

(Also reported in 508 N.W.2d 54.)

†Petition to review denied.

For the defendant-appellant the cause was submitted on the briefs of *Stephen M. Glynn, Robert R. Henak*, and *Craig W. Albee*, of *Shellow, Shellow & Glynn, S.C.*, of Milwaukee, and oral argument by *Stephen M. Glynn*.

For the plaintiff-respondent the cause was submitted on the briefs of *James E. Doyle*, attorney general, with *Sally L. Wellman*, assistant attorney general, of Madison, and oral argument by *Sally L. Wellman*.

Before Wedemeyer, P.J., Sullivan and Schudson, JJ.

SULLIVAN, J. Christopher W. Neumann appeals from a judgment of conviction for second-degree sexual assault. A jury found him guilty of having nonconsensual sexual intercourse by use or threat of force or violence. *See* sec. 940.225(2)(a), Stats.

On appeal Neumann argues that the trial court erroneously instructed the jury that it could not consider evidence of prior sexual intercourse between Neumann and the complainant, J.H., as it related to the issue of consent. He also contends that the trial court erroneously determined that second-degree sexual assault by sexual intercourse requires no intent. Because of the trial court's alleged error in defining the required intent, Neumann claims that the court improperly excluded expert testimony concerning the effects of intoxication on one's state of mind, and refused to instruct the jury on the issues of intent and the effect of voluntary intoxication upon the accused's ability to form such intent. Finally, Neumann argues that if second-degree sexual assault by sexual intercourse does not require proof of intent, that statute is

unconstitutionally violative of his rights to substantive due process and equal protection.

We conclude that the trial court erroneously instructed the jury as to the use of the evidence of the prior sexual relationship between Neumann and J.H. Nonetheless, we conclude that such error was harmless because of the extremely limited relevance of that evidence under the particular circumstances of this case. Finally, we conclude that the offense of second-degree sexual assault by sexual intercourse does not require proof of intent, and as such, is not constitutionally defective. We affirm.

## BACKGROUND

Neumann was charged with sexually assaulting J.H., a woman Neumann had been dating for approximately two years. At the time of the assault, both Neumann and J.H. were university students, and Neumann lived in an apartment with two roommates. J.H. lived with her parents but visited Neumann almost daily and stayed overnight at Neumann's apartment about once per week.

The relationship was apparently somewhat volatile and the couple occasionally broke off their relationship, only to reunite a few days later. Neumann's roommate described the relationship as "real rocky," and testified that the couple was prone to loud arguments. J.H. testified that although the couple argued, there had never been any physical abuse until the incident in question. The relationship was of an intimate nature and the couple had engaged in consensual sexual intercourse prior to the date in question. The couple had been "going steady" until shortly before the incident.

693

Neumann and J.H. had planned to attend a college fraternity formal dinner-dance together on November 9, 1990. J.H. testified that although the couple had broken up before the event, she and Neumann had agreed to go to the function as friends. Over the course of the evening of November 9, the couple consumed alcohol and Neumann became heavily intoxicated.

After leaving the dance, Neumann and J.H. went to a nearby hotel where several fraternity members were hosting a party in a hotel suite. Shortly after arriving at the hotel suite, Neumann, still heavily intoxicated, began yelling at J.H. for allegedly losing his bow tie. He then began to fight with another party-goer, accusing him of intentionally injuring J.H. on the ride to the hotel. At that time, J.H. left the room and was later informed that the fight had come to blows and that Neumann had been removed from the hotel suite by a security guard. Neumann then called the suite from the hotel lobby and asked J.H. to leave with him. J.H. refused.

Marty Karrels, a fraternity member and fellow party-goer, testified for the State. He explained that, while at the party, his girlfriend had asked him if they could give J.H. a ride home, and he agreed. J.H. told Karrels that she did not want to leave the party because she was afraid of Neumann. Karrels convinced J.H. to leave by explaining that he would give her a ride home. J.H. testified that she decided to leave with Karrels after someone told her that Neumann had already gotten a ride and was no longer at the hotel. Karrels, his girlfriend, and another couple escorted J.H. down to the hotel lobby. Unbeknownst to Karrels or the others, Neumann was waiting near the lobby. Karrels testified that, upon seeing Neumann, J.H. became visibly frightened and moved closer to him and the other man

accompanying J.H. Although Karrels could not remember J.H.'s exact words, he recalled that she had expressly stated that she did not want to go with Neumann. After about fifteen minutes of discussion with Neumann, and in order to avoid having to "beat it out,"[1] Karrels decided that he would give Neumann a ride home as well.

Neumann sat in the back seat with another couple, while J.H. sat in the front seat between Karrels and his girlfriend. Karrels drove to Neumann's apartment. Neumann got out of the car. He then reached across Karrels' girlfriend, grabbed J.H.'s arm, and pulled her out of the car with such force that Karrels' girlfriend and J.H. both ended up on the ground outside the car. When Karrels and the other male got out of the car to confront Neumann, J.H. began running down the street, away from Neumann's apartment building. She was without her purse and without any shoes, which had fallen off when Neumann pulled her out of the car. Neumann then chased J.H. At that point, Karrels testified, he did not know what to do because he didn't know Neumann or J.H. very well. He felt, however, that Neumann's act of dragging the women from the car was violent, and was concerned that Neumann could become violent again. Because he was concerned for the safety of his girlfriend and passengers, he drove them to his home. Karrels and his girlfriend called police to report what had happened. The next day, using the address on J.H.'s driver's license, they returned J.H.'s shoes and purse to her family.

J.H. testified that after Karrels drove off, Neumann caught her and forced her to walk back to his apartment. Neumann took her into his apartment

---

[1] We presume that Karrels meant that he wished to avoid a fight or confrontation of a physical nature.

building through a side entrance, and when she refused to walk up the stairs to his second-floor apartment, he dragged her up the stairs. J.H. stated that when they got to Neumann's apartment, his roommates and two guests were there. J.H. testified that she protested and told them she did not want to be there, but the roommates just told Neumann to keep her quiet.

James Michael Shaw, one of Neumann's roommates, testified for the State. He recalled that at about 3:00 a.m. on the morning of November 10, he, his roommate and two guests were in the living room drinking alcoholic beverages and listening to music when Neumann and J.H. came into the apartment arguing. Although he had seen Neumann and J.H. argue before, this time "seemed a little different," but that it might have been due to Neumann's and J.H.'s intoxicated condition.[2] Shaw remembered that Neumann told J.H. in a stern voice to go into his bedroom, but Shaw didn't remember if Neumann was restraining J.H. or not. After the bedroom door closed, the arguing got louder so Shaw or one of the others turned up the volume of the music. Shaw testified that he and his roommate were both fairly intoxicated at the time and that they fell asleep shortly thereafter.

J.H. testified that once in the bedroom, she ran to the window and pounded and screamed for help. Neumann then sat on her to keep her away from the window and pressed his hand on her face to keep her quiet. He told her that if she didn't keep quiet, he would break her jaw so that J.H., a student studying music at the university, would no longer be able to play the flute.

---

[2] It is undisputed that Neumann was intoxicated. Shaw's statement appears to indicate that J.H. may have also been intoxicated. J.H. testified that she was not intoxicated.

He bit her hand, which he told her was also to prevent her from playing the flute. According to J.H., Neumann then started kissing her and said he was going to humiliate her like she had humiliated him.

Neumann then told J.H. to change into a tee-shirt and sweat pants, which J.H. explained she was willing to do because, at this point, she was still wearing her formal gown. After she put on the clothing that Neumann had given her, Neumann forced her back on to the bed and sat on her again. He then started kissing her, took her pants off and forcefully penetrated her vagina, first with his finger, then with his penis.

After the assault, J.H. thought she could escape when Neumann fell asleep. He eventually fell asleep, but she also fell asleep for several minutes because she was exhausted from the late hour and the struggle. She woke up and tried to leave the bedroom without waking Neumann. She testified that, although her first instinct was to run outside, she didn't, because she was only wearing underwear and a tee shirt. She tried, unsuccessfully, to wake up Neumann's roommates, but then went to the phone and began to call for help. Before she could finish dialing, Neumann came from behind, grabbed the phone, and dragged her back to the bedroom where she eventually fell asleep. The next thing she remembers was waking up in the morning and trying to get out of the bedroom again.

Shaw, Neumann's roommate, had slept in the living room. When he woke, he heard more arguing and loud noises. He then saw J.H. open the bedroom door and try to crawl out of the room dressed only in a shirt and underwear. J.H. was lying on the floor pleading for Shaw and the others to help her. Neumann was also lying on the floor, behind J.H., holding onto her leg. According to Shaw, J.H. looked distressed, upset and

had been crying. Neumann then asked his roommates if they "wanted to see [J.H.] naked," and lifted her shirt. Shaw stated that, although he had seen J.H. and Neumann argue in the past, he and his other roommate realized that this was "something different." Neumann's roommates became involved at this point and told Neumann, more than once, to let J.H. go. Eventually, Neumann allowed J.H. to leave.

J.H. testified that after Neumann's roommates told Neumann to release her, Neumann told J.H. to put on her own clothes and get out. J.H. dressed in casual clothing she had left at Neumann's apartment, grabbed only her formal gown, and ran out of the apartment without a coat. J.H. ran to the home of a friend, Lisa B., who lived nearby.

Lisa B. testified that J.H. arrived at her apartment crying. J.H. looked "beat up," her face was red, and she had teeth marks on her hands and multiple bruises. Lisa B. and her boyfriend wrapped J.H. in a blanket because she was cold, talked to her for a while, called the police and then took J.H. to the police station.

Later that same day, Shaw asked Neumann about what he had witnessed. Neumann said he had tried to kiss J.H. and she started to scream rape. Shaw also testified that he had seen J.H. "joke around" before, but that he had no doubt that she was not joking that morning. According to Shaw, Neumann was a "big guy" and was aggressive when he was drunk. Shaw said that he would hesitate to challenge Neumann when he was drunk and angry.

Neumann was the only witness for the defense. He testified that on the night in question, he had been very intoxicated and had no memory whatsoever of most of the events in question. He did not remember leaving the dance, or any events that followed. He stated, how-

698

ever, that he would never sexually assault J.H., that he had loved her and had believed that they would someday marry. He stated that, on the date of the incident, he was 6'2" and weighed 215 pounds.

## CONSENT/RAPE SHIELD INSTRUCTION

Neumann argues that the trial court incorrectly instructed the jury that it was not to use evidence of the parties' previous consensual sexual contacts to determine whether J.H. had consented to sexual intercourse on the date of the incident. We agree, but find the error to be harmless under the particular circumstances of this case.

The trial court has broad discretion with respect to the submission of jury instructions. *State v. Wilson*, 149 Wis. 2d 878, 898, 440 N.W.2d 534, 541 (1989). Whether the charge submitted to the jury is a correct statement of the law, however, presents a legal question to this court for which we owe no deference to the trial court. *See id.*

Generally, evidence of past sexual conduct of a victim is inadmissible in the prosecution of a sexual assault. Section 972.11(2)(b), Stats., provides, in part:

[A]ny evidence concerning the complaining witness's prior sexual conduct or opinions of the witness's prior sexual conduct and reputation as to prior sexual conduct shall not be admitted into evidence during the course of the hearing or trial, nor shall any reference to such conduct be made in the presence of the jury, except the following, subject to s. 971.31(11):
1. Evidence of the complaining witness's past conduct with the defendant.

2. Evidence of specific instances of sexual conduct showing the source or origin of semen, pregnancy or disease, for use in determining the degree of sexual assault or the extent of injury suffered.

In this case, evidence of Neumann's and J.H.'s previous consensual sexual contact was presented to the jury in accordance with sec. 972.11(2)(b)1, Stats. Subsequently, the trial court submitted to the jury this instruction, patterned after Wis J I—Criminal 1200F:[3]

Evidence of prior sexual conduct on the part of [J.H.] has been introduced in this case. Do not consider this evidence in determining whether [J.H.] consented to the alleged sexual intercourse.[4]

---

[3] That instruction provides:

**1200F CAUTIONARY INSTRUCTION: EVIDENCE OF VICTIM'S PRIOR SEXUAL CONDUCT ADMITTED UNDER § 972.11(2)(b)2.**
Evidence of prior sexual conduct on the part of (name of victim) has been introduced in this case. Consider this evidence only in determining [the source or origin of (semen) (pregnancy) (disease)] [the degree of sexual assault] [the extent of injury suffered] [name other acceptable purpose]. Do not consider this evidence in determining whether (name of victim) consented to the alleged sexual (contact) (intercourse).

[4] With regard to the issue of consent, the trial court also instructed the jury:

The second element requires that the defendant had sexual intercourse with [J.H.] without her consent. This element requires that [J.H.] did not freely agree to have sexual intercourse with the defendant.

In deciding whether [J.H.] agreed or did not agree, you should consider what she said and what she did along with all other facts and circumstances. This element does not require that [J.H.] offered physical resistance.

700

Instruction 1200F indicates that it is intended to be used where evidence of the victim's prior sexual conduct is admitted under sec. 972.11(2)(b)2, Stats. This standard instruction informs the jury that the fact that a victim has engaged in sexual conduct with someone other than the defendant is not relevant to the question of whether the victim consented to engage in sexual conduct with the defendant. *See State v. Pulizzano*, 155 Wis. 2d 633, 643, 456 N.W.2d 325, 329 (1990) ("One of the primary objectives of sec. 972.11, was to 'reflect the judgment that most evidence about chastity has far too little probative value on the issue of consent to justify extensive inquiry into the victim's sexual history.' ").

Neumann argues that, unlike evidence of a victim's sexual conduct with third persons, evidence of the victim's sexual conduct with the defendant is relevant to the issue of consent to the charged act, and, that by instructing the jury to not consider the previous consensual sexual conduct between Neumann and J.H. on the issue of consent, the trial court deprived him of an important aspect of his defense.

The State argues that, because Neumann's theory of defense was an inability to remember any events due to intoxication, his defense was akin to an alibi or a denial that sexual conduct occurred.[5] Under such situ-

---

[5] At trial, the State argued that prior evidence of sexual activity between Neumann and J.H. was relevant, but only in as much as it informed the jury that Neumann and J.H. were not strangers. The State contended that J.H's consent to sexual contact on previous occasions was not relevant to whether she consented to sexual intercourse on November 10, 1990. The trial court agreed, and instructed the jury accordingly. While this court has not yet had occasion to consider the relevance issue, the State's reasoning was contrary to the position of courts that

ations, the State contends, consent is not an issue and, therefore, the jury instruction was appropriate. *See e.g. State v. Small*, 631 S.W.2d 616, 617 (Ark. 1982) (where defense is denial, consent is not at issue and prior sexual conduct with defendant is neither relevant nor admissible); *Wilson v. State*, 551 So. 2d 447, 448 (Ala. Crim. App. 1989) (where defense is alibi, consent is not at issue and evidence of prior sexual conduct between victim and defendant is immaterial and inadmissible).

■

We disagree. Neumann did not claim that he had an alibi, nor did he claim that no sexual conduct took place on the night in question. His defense, as presented through his own testimony, was that, although he does not know if he had sexual intercourse with J.H. on the date in question, he does know that he would not have used or threatened force or violence to have intercourse with her without her consent. Consent, therefore, *was* at issue. Thus, the State had a duty to prove nonconsent as an element of the crime and the jury should have been able to consider evidence

have considered the question. *See* Annotation, *Modern Status of Admissibility, in Forcible Rape Prosecution, of Complainant's Prior Sexual Acts*, 94 A.L.R.3d 257, 284-85 (1979). Generally, prior consensual sexual activity between the defendant and the victim *is* considered admissible and relevant to the issue of whether the victim consented to the sexual conduct with which the defendant is charged. *Id.; see also* 23 CHARLES A. WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5389, at 599 (1980) (Federal Rule 412 "accepts the arguments . . . that conduct with the defendant, at least in some circumstances, may be so probative of consent that exclusion would violate the constitutional rights of the defendant."). In any event, the State has abandoned this relevance argument on appeal.

relevant to that issue.[6] Because the jury instruction prohibited the jury from considering the past consensual sexual conduct between Neumann and the victim, we conclude that the instruction was erroneous.

■

Where the trial court incorrectly instructs the jury, this court must set aside the verdict unless that error was harmless, that is to say, unless there is no reasonable possibility that the error contributed to the conviction. *State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231-32 (1985). In the present case, we conclude that the error was harmless.

In order to find Neumann guilty of second-degree sexual assault, the jury had to conclude that J.H. did not consent to sexual intercourse, and, *in addition, that Neumann used or threatened the use of force or violence* . The erroneous jury instruction involved only the element of consent. Thus, the fact that the jury was not allowed to consider evidence of J.H.'s prior sexual conduct in determining whether she consented does nothing to negate the fact that the jury found that Neumann used or threatened force or violence to commit the sexual assault. The record is replete with evidence of the use of force and violence, and Neumann's only evidence to refute the evidence of force or violence was his own testimony that he "would never ever do that."

■

The use of force or violence to effect the act of sexual intercourse is patently inconsistent with a claim of consent, absent some evidence that the complainant would agree to participate in such activity. The evidence in this case, however, would not have allowed the

---

[6] As noted above, the State does not argue that the evidence is irrelevant.

jury to conclude that J.H. consented to sex that included the use or threat of force or violence. The only evidence even remotely related to the issue of prior use of force or violence would lead to the opposite conclusion. J.H. herself denied the presence of any physical force or violence in the relationship until the evening in question, and Neumann insisted that he would never hurt J.H.

At oral argument to this court, defense counsel argued that the erroneous jury instruction precluded the jury's proper consideration of important evidence—that the couple had developed a pattern of fighting, followed by consensual sexual intercourse. Contrary to the implication of that argument, however, no evidence was presented which could reasonably support such a depiction of the couple's prior sexual relationship.

The only evidence that the jury was instructed to ignore when deciding consent consisted of the prior consensual *non-violent* sexual relationship. The fact that J.H. had consented to previous non-violent sexual conduct has virtually no probative value regarding whether she would have consented to sexual intercourse under use or threat of violence.[7] *Cf. People v. Schuldt*, 577 N.E.2d 870 (Ill. App. Ct. 1991) (where

[7] The principle that a prior sexual relationship may be of no probative value in some sexual assault prosecutions is also evident in Wis J I—Criminal 1200E. That instruction is given where the victim of the sexual assault is the defendant's spouse. Section 940.225(6), Stats. The instruction provides:

At the time of the alleged act of sexual (contact) (intercourse), (name of victim) was married to the defendant.
The fact that (name of victim) was married to the defendant does not mean that she consented to sexual (contact) (intercourse). [The fact of marriage may be considered along with all the evidence in the case in determining whether there was consent.]

defendant claimed that conduct charged was not sexual assault but rather consensual sado-masochistic sexual intercourse, details of prior non-forceful consensual sexual intercourse between defendant and complainant were irrelevant).

■

We conclude that there is no reasonable possibility that such evidence would have had any impact upon the jury's decision, particularly in light of the overwhelming evidence of Neumann's use of violence and force, J.H.'s refusal to go willingly to Neumann's apartment, her testimony of the attack itself, Neumann's roommates' testimony of J.H.'s attempt to escape from Neumann's bedroom, and the physical evidence of violence witnessed by J.H.'s friend upon J.H.'s escape. Thus, although we conclude that the jury instruction was erroneous, such error was harmless under the particular circumstances of this case.

### INTENT

Neumann argues that the trial court erred when it determined that second-degree sexual assault by sexual intercourse, sec. 940.225(2)(a), Stats., does not contain the element of intent. Neumann further argues that because intent is an element of the offense, he should have been allowed to rely on voluntary intoxication as a defense. *See* sec. 939.42(2), Stats. (intoxicated

---

The comments to Instruction 1200E indicate that the last bracketed sentence is appropriate where the charge is third or fourth degree sexual assault "because the fact of marriage is relevant to determining whether there was consent in those less aggravated instances." The comments further indicate, however, that the bracketed sentence is *not* appropriate where the defendant is charged with offenses involving the "use of weapons or force or the causing of great bodily harm."

condition is a defense if it negatives the existence of a state of mind essential to the crime). For this same reason, Neumann also argues that he should have been able to present expert testimony to prove that a person who drinks alcohol to the point of "black-out" does not know what he is doing and cannot form an intent to act. We hold that the trial court correctly determined that intent is not an element of the offense.

Whether the statute requires an intent element is a question of statutory interpretation. Statutory interpretation presents this court with a question of law that we review *de novo. Manor v. Hanson,* 123 Wis. 2d 524, 533, 368 N.W.2d 41, 45 (1985). The goal of statutory interpretation is to determine legislative intent. *See State v. Stoehr,* 134 Wis. 2d 66, 75, 396 N.W.2d 177, 180 (1986). The Wisconsin Supreme Court has explained that in determining legislative intent regarding scienter, a reviewing court should look to "the language of the statute, the legislative history of the statute, the seriousness of the penalty, the purpose of the statute and the practical requirements of effective law enforcement." *See id.* at 76, 396 N.W.2d at 180.

The plain language of sec. 940.225, Stats., indicates that some violations of that statute require the element of intent, while others do not. For example, a defendant may be charged with a violation of sec. 940.225(2)(a) for either sexual intercourse or sexual contact without consent, by use or threat of force or violence. If the offense involves sexual contact, the State must prove an intentional touching of an intimate part of the body, for the purpose of sexually degrading or sexually humiliating the complainant, or

706

for the purpose of sexually arousing or gratifying of the defendant. *See* sec. 940.225(5)(b), Stats.[8] By the language of the statute, the legislature has clearly indicated that sexual contact requires intent, both in the form of an intentional act, and a purpose for that act. By contrast, the legislature defined sexual intercourse without any reference to intent or purpose, and instead, defined the acts that would constitute sexual intercourse. *See* sec. 940.225(5)(c), Stats.[9] A presumption that the legislature acts with knowledge of existing laws, particularly statutes under consideration as part of the same legislation, compels this court to conclude that the legislature purposely distinguished between the intent necessary for contact and intercourse. *See In re R.E.H.,* 101 Wis. 2d 647, 652, 305 N.W.2d 162, 166 (Ct. App. 1981). Thus, the language of

---

[8] Section 940.225(5)(b), Stats., provides:

"Sexual contact" means any intentional touching by the complainant or defendant, either directly or through clothing by the use of any body part or object, of the complainant's or defendant's intimate parts if that intentional touching is either for the purpose of sexually degrading; or for the purpose of sexually humiliating the complainant or sexually arousing or gratifying the defendant or if the touching contains the elements of actual or attempted battery under s. 940.19 (1).

[9] Section 940.225(5)(c), Stats., provides:

"Sexual intercourse" includes the meaning assigned under s. 939.22 (36) as well as cunnilingus, fellatio or anal intercourse between persons or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening either by the defendant or upon the defendant's instruction. The emission of semen is not required.

Section 939.22(36), Stats., provides in part:

"Sexual intercourse" requires only vulvar penetration and does not require emission.

the statute indicates that no intent need be proven for the offense of sexual assault by sexual intercourse.

Legislative history also indicates that no particular intent is required. Section 940.225, Stats., was created in 1975 upon the repeal of sec. 944.01, Stats. (1973),[10] the rape statute. The former sec. 944.01 contained no language indicating a requisite intent. *See, e.g.,* sec. 939.23, Stats. (1973) & (1991-92).[11] Thus, the Wisconsin Supreme Court determined that no intent was required. *Redepenning v. State,* 60 Wis. 2d 471, 480-81, 210 N.W.2d 673, 678 (1973); *Brown v. State,* 59 Wis. 2d 200, 214, 207 N.W.2d 602, 609 (1973). In creating the new sexual assault statute, the legislature broadened the meaning of "sexual intercourse" as it was found in the rape statute, but did not add an intent element into the sexual assault by sexual intercourse offense, despite the fact that the supreme court had concluded that intent was not an element of the former rape statute. Where a legislative act has been construed by the supreme court, the legislature is presumed to know that in the absence of a change in

---

[10] Section 944.01, Stats., provided, in part:

Any male who has sexual intercourse with a female he knows is not his wife, by force and against her will, may be imprisoned not more than 30 years.

[11] Section 939.23, Stats., provides:

(1) When criminal intent is an element of a crime in chs. 939 to 951, such intent is indicated by the term "intentionally", the phrase "with intent to", the phrase "with intent that", or some form of the verbs "know" or "believe".

Likewise, secs. 939.24 and 939.25, Stats., provide that if criminal recklessness or criminal negligence are elements of a crime, that element would be indicated within the statute by use of the words, "reckless," "recklessly," or "negligent."

the law, the court's construction will remain unchanged. *Reiter v. Dyken*, 95 Wis. 2d 461, 471, 290 N.W.2d 510, 515 (1980). The fact that the legislature did not subsequently add an intent element to the statute leads this court to the conclusion that the legislature intentionally omitted any intent requirement from the newly created offense of sexual assault by sexual intercourse.[12]

We look next to the seriousness of the penalty as a criterion for determining legislative intent regarding scienter. That a conviction under sec. 940.225(2)(a), Stats., carries with it a maximum penalty of ten years imprisonment does not lead us to the conclusion that the legislature intended intent to be an element of the crime. In *State v. Stanfield*, 105 Wis. 2d 553, 561 & n.10, 314 N.W.2d 339, 343 & n.10 (1982), *overruled on other grounds, State v. Poellinger*, 153 Wis. 2d 493, 504 n.5, 451 N.W.2d 752, 757 n.5 (1990), the supreme court noted, "[t]his court has upheld strict liability statutes containing far more severe penalties than that at issue here," citing in particular, *Redepenning v. State*, 60 Wis. 2d 471, 210 N.W.2d 673 (1973), in which the maximum penalty for rape was 30 years imprisonment. *See State v. Lederer*, 99 Wis. 2d 430, 435, 299 N.W.2d 457, 461 (Ct. App. 1980) (although punishment for third degree sexual assault is potentially severe, legislature

---

[12] Citing *Redepenning* and *Brown*, the supreme court has noted that sec. 940.225, like the former rape statute, contains no words that would indicate that intent is an element of the offense. *Hagenkord v. State*, 100 Wis. 2d 452, 483 n.9, 302 N.W.2d 421, 437 n.9 (1981). "The new jury instruction asserts that criminal intent, therefore, continues to be absent as a required element of the crime, creating a type of 'strict liability.' " *Id.*

is not "precluded from creating a strict liability offense where substantial penalties are to be imposed").

Nor do the practical requirements of law enforcement compel this court to read intent into the statute. The State argues, and we agree, that the legislature most likely concluded that a defendant's intent should not be an element of the crime because to allow for a defendant to claim the defense of intoxication, and other defenses based upon lack of intent, would be contrary to the goals of enforcement and protection of bodily security.

Thus, we conclude that the offense of second-degree sexual assault, as committed through sexual intercourse, does not require proof of intent.

## CONSTITUTIONALITY OF SECTION 940.225(2)(a) & (5)(c), STATS.

Neumann argues that if the offense of sexual assault by sexual intercourse does not include the element of intent, the statute is constitutionally invalid on the grounds of substantive due process and equal protection. We disagree.

"The constitutionality of a statute is a question of law which this court may review without deference to the lower court." *State v. McManus*, 152 Wis. 2d 113, 129, 447 N.W.2d 654, 660 (1989). Statutes are presumed to be constitutional and will be upheld unless the party challenging the statute shows that the statute is unconstitutional beyond a reasonable doubt. *Id.*

Neumann first challenges the constitutionality of the statute on the grounds of overbreadth. He argues that if the statute contains no intent requirement, it is violative of substantive due process because it seeks to

proscribe conduct that the state has no authority to condemn. Specifically, Neumann points out that, due to the broad definition of "sexual intercourse," any vaginally or anally intrusive medical procedure would technically violate sec. 944.225, Stats., if the patient were not able to consent, as would be the case with a child, an unconscious person, or a mentally incompetent person.

The Wisconsin Supreme Court has explained the doctrine of overbreadth:

> A statute is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate. The essential vice of an overbroad law is that by sweeping protected activity within its reach it deters citizens from exercising their protected constitutional freedoms, the so-called "chilling effect."

*Bachowski v. Salamone*, 139 Wis. 2d 397, 411, 407 N.W.2d 533, 539 (1987) (citation omitted).

The court has further explained that "it is permissible under the argument of overbreadth which rests on substantive rather than procedural due process grounds to raise hypothetical examples of the section's applicability to show that the section deters protected activities." *State v. Driscoll*, 53 Wis. 2d 699, 703, 193 N.W.2d 851, 855 (1972).

Neumann has alleged that the statute violates the right to substantive due process and, in support, he has raised hypothetical examples of the statute's potential application to behaviors other than his own. In so doing, however, he has failed to specify a "protected constitutional freedom[ ]" that would be infringed by

such an application of the statute. *See Bachowski*, 139 Wis. 2d at 411, 407 N.W.2d at 539.[13] Thus, we reject his overbreadth argument.[14]

---

[13] Typically, an overbreadth challenge is based on the argument that the statute has a chilling effect on the freedom of speech, *see id.*, however:

> [t]he conflict may [also] be with the freedom of . . . press, assembly, religion, association, or privacy; with the right to be secure against illegal searches; with the privilege against self-incrimination; or with the prohibition on cruel and unusual punishment.

WAYNE R. LaFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW sec. 2.14 (1986). Neumann has not alleged that any of these rights would be infringed by the hypotheticals he poses.

[14] We further note that this court follows, as a principle of interpretation, the rule that the court need not interpret a statute based only upon the statutory language where a literal application of that language would lead to an absurd result. *See Coca-Cola Bottling Co. v. La Follette*, 106 Wis. 2d 162, 170, 316 N.W.2d 129, 133 (Ct. App. 1982). In such a situation, the "spirit or intention" of a statute "govern[s] over the literal meaning of the language used." *Town of Menominee v. Skubitz*, 53 Wis. 2d 430, 437, 192 N.W.2d 887, 890 (1972).

Neumann's substantive due process claim rests upon an interpretation of the statute that leads to an absurd result. Although his argument is based on the literal language of the statute, it stretches all bounds of reason to believe that the legislature intended to include bona fide medical, health care, and hygiene procedures within the definition of "sexual intercourse." Other states have avoided this potential problem by excepting from the definition of "sexual intercourse" such procedures. For example, Illinois statutes provide:

> Any medical examination or procedure which is conducted by a physician, nurse, medical or hospital personnel, parent, or caretaker for purposes and in a manner consistent with reasonable medical standards is not an offense under [the sexual assault statutes].

Neumann also claims that, unless the definition of sexual intercourse includes an element of intent, the statute is unconstitutionally violative of equal protection. Specifically, he argues that there is no rational basis to support the legislature's requirement of intent for sexual contact but not for sexual intercourse. He argues that in both situations, the violator has committed an act which is equally serious and culpable.

The Wisconsin Supreme Court has previously explained:

> Equal protection does not deny a state the power to treat persons within its jurisdiction differently; rather, the state retains broad discretion to create classifications so long as the classifications have a reasonable basis. The fact a statutory classification results in some inequity, however, does not provide sufficient grounds for invalidating a legislative enactment. Where, as here, a suspect classification is not alleged, the legislative enactment "must be sustained unless it is 'patently arbitrary' and bears no rational relationship to a legitimate government interest." "If the classification is reasonable and practical in relation to the objective, that is sufficient and doubts must be resolved in favor of the reasonableness of the classification."

*McManus*, 152 Wis. 2d at 131, 447 N.W.2d at 660-61 (citations omitted).

The legislature's rationale for requiring intent when a person is charged with sexual contact rather than sexual intercourse is quite clear. The proscribed act under the definition of sexual contact is the inten-

---

720 ILCS 5/12-18(b) (West 1992) (formerly Ill. Rev. Stats., ch. 38, para. 12-18).

tional touching of the clothed or unclothed "breast, buttock, anus, groin, scrotum, penis, vagina or pubic mound of a human being." Sections 940.225(5)(b) and 939.22(19), Stats. There exist many circumstances under which one person might unintentionally touch certain defined intimate areas of another person. The same can rarely, if ever, be said for the act of penetration. Thus, the fact that the legislature chose to require a particular "purpose" for the touching in the definition of sexual contact is rational. Neumann has failed to meet his burden of showing the unconstitutionality of the statute on equal protection grounds.

In sum, although we conclude that the jury instruction regarding the use of prior sexual relationship evidence was erroneous, the error was harmless under the particular circumstances of this case. We conclude that the offense of second-degree sexual assault by sexual intercourse does not require proof of intent, and as such, is not unconstitutional.

*By the Court.*—Judgment affirmed.