Christopher W. NEUMANN,
Plaintiff–Appellant,

v.

Eurial K. JORDAN, Administrator, Division of Probation and Parole, and James Doyle, Attorney General for the State of Wisconsin, Defendants–Appellees.

No. 95–3253.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 13, 1996.

Decided May 28, 1996.

Stephen M. Glynn and Robert R. Henak (argued), Shellow, Shellow & Glynn, Milwaukee, WI, for petitioner-appellant.

Sally L. Wellman (argued), Office of Atty. Gen., Wisconsin Dept. of Justice, Madison, WI, for respondent-appellee Jordan.

James E. Doyle, Office of Atty. Gen., Wisconsin Dept. of Justice, Madison, WI, for respondent-appellee Doyle.

Before CUMMINGS, BAUER, and MANION, Circuit Judges.

BAUER, Circuit Judge.

Christopher Neumann appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. We affirm.

## BACKGROUND

The facts of the case, as related by the Wisconsin Appellate Court, are not in dispute. Given that the following analysis is fact-intensive, we will describe them in detail. Neumann was convicted of two counts of sexually assaulting J.H., a woman he had been dating for two years. The relationship was intimate and Neumann and J.H. had engaged in consensual sexual intercourse pri-

or to the night of the assault. At the time of the assault, both Neumann and J.H. were college students. The relationship was somewhat rocky and the couple was prone to loud arguments. However, prior to the assault, Neumann had never physically abused J.H.

On the night of November 9, 1990, Neumann and J.H. attended a formal fraternity dance, at which Neumann became heavily intoxicated. At a post-dance party at a nearby hotel, Neumann began yelling at J.H. and then instigated a fistfight with another party goer. A short time later, Neumann was removed from the party by a hotel security guard. Neumann called J.H. from the lobby, but she refused to leave with him. At trial, another fraternity member, Marty Karrels, testified that his girlfriend asked him to give J.H. a ride home from the party because J.H. was afraid of Neumann. Karrels escorted J.H. to the lobby where they encountered Neumann. J.H. was visibly frightened of Neumann. To avoid a fight with Neumann, Karrels agreed to give Neumann a ride home. Neumann sat in the backseat, while J.H. was in the front between Karrels and his girlfriend.

When they arrived at Neumann's apartment, Neumann got out of the two-door car and then reached across Karrels' girlfriend, grabbed J.H.'s arm, and pulled her out of the car with such force that Karrels' girlfriend and J.H. ended up on the ground. When Karrels got out to confront Neumann, J.H. began running away without her purse or shoes. Neumann ran after J.H., but Karrels and his entourage got back in the car and drove home. Upon arriving home, they called the police to report the incident.

Meanwhile, Neumann caught J.H., forced her back to his apartment building, and dragged her up the stairs to his second floor unit. One of Neumann's roommates, James Shaw, testified that Neumann and J.H. came into the apartment around 3:00 a.m. and that they were arguing. He had seen them argue before, but this was "different." According to Shaw, Neumann was a big guy who became aggressive when drunk. Shaw heard Neumann tell J.H. in a stern voice to go into his bedroom. After the bedroom door was closed, the arguing got louder so Shaw or one of the other roommates turned up the volume on the stereo.

J.H. testified that once in the bedroom, she ran to the window and screamed for help. Neumann sat on her to restrain her (he outweighed her by almost 100 pounds), and threatened to break her jaw—J.H. was a flutist—if she did not keep quiet. He also bit her hand in order to prevent her from playing the flute. Then, Neumann started kissing J.H. and told her that he was going to humiliate her. He took her pants off, and forcefully penetrated her vagina, first with his finger, and then with his penis.

After the assault, J.H. thought she could escape when Neumann fell asleep. He eventually did, but J.H. also drifted off because she was so exhausted by the struggle. When she awoke, she thought about running outside, but she was only wearing underwear and a t-shirt. She tried to wake up Neumann's roommates and went to the phone to call for help. Before she could dial 911, Neumann grabbed her and dragged her back to his bedroom. She eventually fell back asleep.

When Shaw awoke in the living room, he heard more arguing and loud noises coming from Neumann's room. He saw J.H. open the door and try to crawl out of the room wearing only underwear and a t-shirt. J.H. pleaded with Shaw to help her. Neumann was lying on the floor behind J.H. holding onto her leg. According to Shaw, J.H. looked distressed and upset and obviously had been crying. Neumann asked his roommates if they wanted to see J.H. naked and lifted her shirt. Shaw testified that although he had seen them argue before, this was "something different." Finally, Shaw and the other roommates got involved and Neumann allowed J.H. to leave.

A friend of J.H., Lisa B., testified that J.H. arrived at Lisa's apartment that morning looking "beat up." Her face was red, she had multiple bruises, and she had teeth marks on her hands. Lisa and her boyfriend wrapped J.H. in a blanket, comforted her, and then took her to the police station. Later that same day, Shaw asked Neumann

about what had happened. Neumann said that he had tried to kiss J.H. and that she started to scream rape. Shaw testified that he had seen J.H. "joke around" before, but that she was not joking that morning.

Neumann was the only defense witness. He testified that he had practically no memory of the events in question. He did not remember leaving the dance, or the events that followed. He did not even remember discussing the events with Shaw the next day. He testified, however, that he never would have sexually assaulted J.H. because he loved her and believed that they would someday marry.

Prior to trial, the court ruled that evidence of Neumann and J.H.'s prior sexual relationship was admissible at trial on the issue of consent. This was correct under the Wisconsin rape shield law. Wis. Stat. § 972.11(2)(b)(1). However, after the close of evidence, the judge instructed the jury that they could not consider the couple's prior sexual relationship in deciding whether J.H. had consented to sex with Neumann. This was error under Wisconsin law. *State v. Neumann*, 179 Wis.2d 687, 508 N.W.2d 54, 60 (Wis.App.1993), *rev. denied*, — Wis.2d ——, 513 N.W.2d 406 (1994). The jury returned a guilty verdict on both counts of sexual assault. The court sentenced Neumann to four years imprisonment to be followed by four years of probation. On appeal, the Wisconsin Appellate Court held that the pertinent instruction had been error, but that it was harmless. *Id.*, 508 N.W.2d at 61. Neumann's federal habeas petition followed.

## ANALYSIS

█ Federal courts are authorized to grant a writ of habeas corpus when a person is held in custody under a state court judgment in violation of the United States Constitution. 28 U.S.C. § 2254. In reviewing the state court proceedings, we presume that the factual findings of the state court are correct if those findings follow a hearing on the merits and are fairly supported by the record. *See Kavanagh v. Berge*, 73 F.3d 733, 735 (7th Cir.1996). We review the district court's findings of fact under a clearly erroneous standard. *Id.* We review the merits of

the district court's legal conclusions *de novo*. *Id.*

### A. Erroneous Rape Shield Instruction

█ Neumann concedes that the fact that the Wisconsin Appellate Court found the trial court's instruction erroneous under Wisconsin law is not dispositive for purposes of this case because a violation of state law does not necessarily violate the Constitution. *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 479, 116 L.Ed.2d 385 (1991). However, a state law violation may be so extreme as to rise to the level of a due process violation "if it created a serious risk of convicting an innocent person." *Eaglin v. Welborn*, 57 F.3d 496, 501 (7th Cir.) (en banc), *cert. denied*, — U.S. ——, 116 S.Ct. 421, 133 L.Ed.2d 338 (1995), *citing Estelle*, 502 U.S. at 72, 112 S.Ct. at 482.

As a general matter, the trial court's instruction very well could create a risk of convicting an innocent person. The issue at rape trials often comes down to the credibility of the victim against that of the defendant. Where the victim and defendant had a prior sexual relationship, the issue of consent especially may be highlighted. Assuming a defendant raises the defense of consent and introduces evidence of a prior sexual relationship between the defendant and the victim, it is highly destructive to the defense to eliminate such evidence from the jury's consideration. But that is only in the abstract. Neumann's case was very different.

█ After carefully reviewing the record, we conclude that the trial court's state law error did not create a risk of convicting an innocent man. In other words, the evidence against Neumann was overwhelming. First, in contrast to many "date-rape" prosecutions, Neumann's defense was not actually that the victim had consented. Instead, Neumann testified that he did not remember any of the events of the night in question because he had been too drunk. Nevertheless, he testified that he never would have raped the victim because he loved her and planned on marrying her. Neumann argues now that the prior sexual relationship was crucial to the case because "it was not at all uncommon for them to fight like cats and dogs and soon thereafter engage in consensual, non-violent

sexual intercourse." The Wisconsin Appellate Court rightly rejected this argument by pointing out that "no evidence was presented which could reasonably support such a depiction of the couple's prior sexual relationship." *Neumann*, 508 N.W.2d at 61.

Neumann takes issue with the district court's finding that the evidence of the couple's prior sexual relationship was not "vital" to Neumann's defense and therefore the faulty instruction was not unconstitutional. Neumann points us to a line of cases which he says indicates that any state court evidentiary ruling that excludes evidence relevant to a defendant's defense is unconstitutional. *See Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). This is simply wrong. First, this case does not involve the exclusion of evidence but a faulty jury instruction. Second, the faulty instruction limited the jury's consideration of the couple's prior sexual relationship only in so far as it related to consent. The trial court permitted the jury to consider the evidence with respect to the issues of force or violence. The Wisconsin Appellate Court considered this factor to be dispositive in its harmless error analysis because there was no evidence that J.H. had ever consented to sex under the use or threat of violence prior to the assault. *Neumann*, 508 N.W.2d at 61. We consider this significant in reaching our conclusion that the erroneous jury instruction did not rise to the level of a constitutional violation.

Finally, and most importantly, the Supreme Court, as well as this court, has been resolute in ruling that errors of state law, especially errors based on a trial court's evidentiary rulings or jury instructions, do not, in and of themselves, violate the Constitution. *See, e.g., Estelle*, 502 U.S. at 67, 112 S.Ct. at 482; *Eaglin*, 57 F.3d at 501. At bottom, Neumann's claim fails because the jury instruction precluded the jury from considering evidence that was only marginally significant when compared to the overwhelming weight of contrary evidence. J.H.'s prior consent does not imply, by itself, that she consented on the night in question. *Tyson v. Trigg*, 50 F.3d 436, 448–49 (7th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 697, 133 L.Ed.2d 655 (1996). Neumann failed to present any evidence that contradicted the compelling testimony of the various witnesses about the incident. Neumann's argument that the case really came down to his word against the victim's is worthless. "As in most rape cases, the key witness, and only eyewitness ... was the victim of the alleged rape." *Sandoval v. Acevedo*, 996 F.2d 145, 148 (7th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 307, 126 L.Ed.2d 255 (1993). But here, there was more—much more. The prosecution presented the compelling testimony of disinterested witnesses who observed Neumann's behavior before and after the rape. Their testimony buttresses J.H.'s testimony. Neumann did not contradict this evidence, he merely claimed that he was too drunk to remember. Even if the jury had been permitted to consider the allegedly "vital" evidence of the couple's prior sexual conduct vis-a-vis consent, the jury would have returned with the identical verdict. The trial court's instruction did not rise to the level of constitutional error.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.