*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0151a.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

LEWIS RODNEY GAGNE,

       *Petitioner-Appellee,*

    *v.*

RAYMOND BOOKER, Warden,

       *Respondent-Appellant.*

No. 07-1970

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 04-60283—Marianne O. Battani, District Judge.

Argued: June 9, 2009

Decided and Filed: May 25, 2010

Before: BATCHELDER, Chief Judge; NORRIS and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Janet A. Van Cleve, MICHIGAN ATTORNEY GENERAL'S OFFICE, Lansing, Michigan, for Appellant. Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** William C. Campbell, MICHIGAN ATTORNEY GENERAL'S OFFICE, Lansing, Michigan, for Appellant. Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, Grand Rapids, Michigan, for Appellee. Benjamin C. Mizer, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Amici Curiae. Lewis Gagne, Detroit, Michigan, pro se.

    NORRIS, J., delivered the opinion of the court, in which KETHLEDGE, J., joined, with Judge KETHLEDGE (pp. 18-23), also delivering a separate concurring opinion. BATCHELDER, C.J. (pp. 24-36), delivered a separate dissenting opinion.

_____

## AMENDED OPINION

_____

    ALAN E. NORRIS, Circuit Judge. Petitioner Lewis Gagne and his co-defendant, Donald Swathwood, were each charged with three counts of criminal sexual misconduct for

forcibly and simultaneously engaging in sexual activities with Gagne's ex-girlfriend, Pamela Clark.  All of the charges arose out of events occurring over the course of one night.  The key question at trial was one of consent.  The jury convicted Gagne of two counts, and Swathwood of three.  Gagne filed a petition for a writ of habeas corpus, 28 U.S.C. § 2254, and the district court granted him relief on the basis that the state trial court's decision to exclude certain evidence had violated Gagne's due process right to present a meaningful defense.  Respondent, Warden Raymond Booker, represented by the Michigan Attorney General ("the State"), appealed.  We now affirm.

**I.**

**A.**

Gagne and Swathwood were each charged with three counts of first-degree criminal sexual conduct.  Mich. Comp. Laws § 750.520b(1)(f).[1]  Gagne's three charges included two counts of forcible penis to mouth penetration and one count of forcible penis to vagina penetration, charges for which consent is a full defense.  *See People v. Waltonen*, 7238 N.W. 2d 881, 887 (Mich. Ct. App. 2006), *appeal denied*, 731 N.W. 2d 178 (Mich. 2007); see *also People v. Hearn*, 300 N.W.2d 396, 398 (Mich. Ct. App. 1980).  A jury convicted Gagne of forcible vaginal penetration and of one count of forcible oral penetration.

The parties do not dispute the background facts that set the stage for what occurred on the night of July 3, 2000.  The complainant, Clark, and Gagne dated from some time in January until early June of that year.  Gagne moved in with Clark in late January or early February, and the two lived together until their relationship ended.  Throughout this time, Clark worked, but Gagne did not, and Gagne would frequently use her work phone and her personal ATM card, sometimes without her knowledge.

---

[1]That statute provides as follows:

Sec. 520b. (1) A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and . . .

(f) The actor causes personal injury to the victim and force or coercion is used to accomplish sexual penetration.

Mich. Comp. Laws § 750.520b(1)(f).

Also undisputed were the events that took place around midnight on July 3, 2000. After spending most of that day doing yardwork, during which time she consumed most of a pint of vodka, Clark retired to her house to watch television. Gagne arrived uninvited at about 10:45 p.m. He informed Clark that he and his friend Swathwood, whom Clark also knew, were going to move to California. Shortly thereafter Swathwood and a third man, Michael Stout, arrived. The group began drinking beer and possibly smoking marijuana. By Clark's own estimate she consumed nine or ten beers during this time.

This point in the story marks the beginning of the facts contested at trial. We begin with the version urged by the prosecution, which was presented almost entirely through Clark's testimony. At some point after midnight, Clark and Gagne took a shower together. Afterwards, Clark, who believed that Swathwood and Stout had left, participated in oral sex with Gagne in the living room. Swathwood entered the room and began engaging in intercourse with her while Gagne forcibly held her head down. A few minutes later, Gagne released Clark and the two went into the bedroom where Clark told Gagne she did not want to have sex with Swathwood. Clark then began performing oral sex with Gagne. Swathwood again entered the room and began engaging in intercourse with her. The men held Clark down, and each had intercourse and oral sex with her, at various points slapping her buttocks and using sexual devices that Clark kept in her room.

At approximately five a.m. the men tired of this activity and left the room. Clark went into the bathroom, vomited, took a shower, and returned to bed where she slept until approximately noon the next day. At that time she discovered her ATM card was missing, and upon further investigation learned that at 5:28 that morning someone had withdrawn $300 from her account, and had tried to withdraw more money twice in the following fifteen minutes.

The defense's version of events differed primarily on the issue of consent. According to Gagne and Swathwood, the group purchased and smoked some crack cocaine at around midnight. Clark then began talking with the men about engaging in

group sex, and in large part instigated the group sexual activity, first in the living room and then later in the bedroom. Their description of the sexual activities differed only in that Clark consented to them. They concede for instance, that they spanked Clark. At about five a.m. Gagne and Clark agreed that Gagne should leave and purchase more crack with money withdrawn using her ATM card. All three men left in Clark's car. Gagne dropped Stout off at home, withdrew $300 from an ATM using Clark's card, and then drove to a street corner and purchased crack. The defendants became nervous when they saw police cars in the area, so instead of returning home, they drove to a cemetery and smoked the crack. The defendants testified that they returned to Clark's house later that morning and Gagne returned her ATM card. Clark was angry and told Gagne to leave, so he did.

Clark testified that, two days later, she told her adult son that she had been raped. She also told the police, and saw several doctors. The doctors noted that she had some bruising but no trauma to her wrists or shoulders, which are typically present after a sexual assault. Nor did any of the doctors find any internal or external tears to Clark's vagina or rectum.

**B.**

As noted above, at the heart of Gagne's petition for habeas corpus is the trial judge's exclusion of certain evidence from the trial. As required by the Michigan rape shield law, Mich. Comp. Laws § 750.520j(1) & (2),[2] Gagne filed a motion *in limine* seeking to introduce evidence regarding several aspects of Clark's prior sexual experiences and tastes. The trial judge denied the motion in part, excluding evidence

---

[2]The substantive portion of that law provides:

Sec. 520j (1) Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall not be admitted under sections 520b to 520g unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:

(a) Evidence of the victim's past sexual conduct with the actor.

Mich. Comp. Laws § 750.520j (1) (a).

regarding two subjects that are relevant here: an incident of group sexual activity involving Gagne, Clark, and a man named Ruben Bermudez; and Clark's solicitation of Gagne's father to join her and Gagne in group sex. The court's exclusion of this evidence gives rise to this appeal.

The court also granted Gagne's motion in part, and, because it is especially relevant to our analysis, we recount in some detail the evidence the court decided to admit regarding sexual activity that occurred one night involving Gagne, Swathwood, Clark, and two other females they met at a bar called Tony's Lounge ("the Tony's Lounge incident"). In the spring of 2000, Clark, Swathwood, and Gagne went to Tony's Lounge, where they drank for some time. At the bar Swathwood met two women. All five of them departed together and went to a house belonging to one of the women. There were people at the house when they arrived. Clark and Gagne began to engage in some sort of "sexual behavior" in the living room while Swathwood had intercourse nearby with the other two women. Clark testified that she did not "engage in sex of whatever kind with Donny Swathwood" while they were in the living room. When someone knocked at the door, Clark and Gagne relocated to the bedroom where they began alternately having intercourse and arguing. Swathwood brought the other women into the bedroom. Gagne and Clark's argument escalated, and finally Clark left and went home.

Clark was extremely intoxicated during these events; she testified that she drove home that night but did not remember doing so. The next day, Gagne informed her that there was more from the previous night that she did not remember, including that she had engaged in oral sex with Swathwood. Clark testified that she had no memory of this. Nonetheless, she believed Gagne and told others what had happened with Swathwood, including Swathwood's girlfriend at the time.

Finally, Clark testified that, at some later date, she and Gagne "were talking about being with other men or being with other women" sexually, and discussed the Tony's Lounge incident:

> And I told him that, you know, I honestly have not been with any other man except what you told me about [Swathwood] and I don't remember that. And he said to me, I was just lying 'cause I wanted to go to bed with the same – the girl that [Swathwood] was having sex with. And I – and then he told me that he did have sex with her that night. And she – the girl had told me something different.

For his part, Swathwood testified that Clark engaged in oral sex with him that night in the presence of Gagne and the other two women. Swathwood answered "yes" when asked, "Fair assessment to say this was kind of a group-sex, orgy-type situation?"

In her closing argument, the prosecutor repeatedly emphasized the unlikeliness of the defendants' version of the story, which, in her words, was "more consistent with the pornographic movie than real life." The defense responded by attacking Clark's credibility and arguing that she had consented by pointing to the Tony's Lounge incident as evidence of this theory. During rebuttal, the prosecution argued to the jury, that, insofar as the Tony's Lounge incident was concerned, "Even if you believe, contrary to . . . what Ms. Clark told you, that she did engage in consen[s]ual sexual contact with Mr. Swathwood, the nature of the contact and relations here were 190 degrees [sic] different. That situation did not involve, ladies and gentlemen, two men."

On direct appeal, Gagne raised a number of claims, only one of which is relevant here: that the trial court violated his due process right to present a defense when it excluded the evidence regarding the group sexual activity with Bermudez, and Clark's solicitation of Gagne's father to participate in group sex with her and Gagne.

The state appellate court acknowledged that rape shield statutes can occasionally abridge a defendant's constitutional rights, but concluded that the evidence of the group sexual activity with Bermudez and the invitation to Gagne's father were irrelevant because they involved third parties, not Swathwood. *People v. Swathwood*, Nos. 235540 and 235541, 2003 WL 1880143, at *1-2 (Mich. Ct. App. Apr. 15, 2003). Additionally, the Bermudez incident was said to be even less relevant because it had occurred while Clark and Gagne were dating; by July 3, the couple had been separated for three weeks. *Id.* at *2. The court of appeals also determined that Gagne's constitutional rights were

not violated because he was allowed to present evidence regarding the Tony's Lounge incident, which the court felt sufficiently demonstrated that Clark "was not averse to group sexual activity." *Id.* at *3.

The court of appeals affirmed Gagne and Swathwood's convictions and remanded for sentencing determinations that are irrelevant to this appeal. The state court proceedings ended when the Michigan Supreme Court denied Gagne leave to appeal.[3] *People v. Gagne*, 673 N.W.2d 755 (Mich. 2003) (unpublished table decision).

Gagne filed a *pro se* petition for a writ of habeas corpus, asserting four claims. The district court granted relief on the due process claim arising from the trial court's exclusion of evidence. The court determined that relief was warranted because the excluded evidence was highly relevant since it involved occurrences remarkable in their similarity to the events on the night of July 3. This evidence was crucial to the defense because this case was essentially a "credibility contest" between Clark on the one hand, and Gagne and Swathwood on the other. The court granted Gagne a conditional writ of habeas corpus, and the State timely appealed.

## II.

We review a district court's decision to grant habeas relief *de novo*. *Hereford v. Warren*, 536 F.3d 523, 527 (6th Cir. 2008). Because Gagne filed his habeas petition after the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, we review the last reasoned state court decision on the issue to determine whether that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). A state court's determination is contrary to clearly established federal law if "the state court arrives at a conclusion

---

[3]At this point Gagne and Swathwood's legal proceedings parted ways. Swathwood missed the deadline to apply for leave to appeal in the Michigan Supreme Court, so his application was denied. *See Swathwood v. Lafler*, No. 04-CV-72251, 2009 WL 322041, at *3 (E.D. Mich. Feb, 10, 2009). He also filed a habeas petition, but the court denied relief because his claims were procedurally defaulted due to his missing the deadline in the Michigan Supreme Court. *Id.* at *8.

opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state-court decision is an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

## III.

The Supreme Court has repeatedly recognized that the right to present a complete defense in a criminal proceeding is one of the foundational principles of our adversarial truth-finding process: "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)) (internal quotation marks omitted). But a "meaningful opportunity" is not "every opportunity," and relevant evidence is frequently excluded from trial. Trial judges must make "dozens, sometimes hundreds" of evidentiary decisions throughout the course of a typical case, and rarely are these of constitutional significance: "the Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane*, 476 U.S. at 689-90 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)) (alterations and omissions in original). But while the Constitution leaves much in the hands of the trial judge, "an essential component of procedural fairness is an opportunity to be heard." *Id.* at 690.

The Supreme Court in *Crane* made clear that whether a defendant has a constitutional right to present evidence turns on the extent to which that evidence is so "highly relevant" that it becomes "indispensable" to the success of the defense. 476 U.S.

at 691. In that case, the trial court excluded evidence of the circumstances surrounding the defendant's confession, which the defense argued would have cast doubt on the credibility of that confession. *Id.* at 684-86. The Supreme Court, in determining that this exclusion violated the defendant's right to present a meaningful defense, explained that the "opportunity [to be heard] would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." *Id.* at 690. The evidence, which related to the physical circumstances of the confession, was so "highly relevant to [the] reliability and credibility" of the confession, and the confession was so integral to the defense, that the excluded evidence was "all but indispensable to any chance of [that defense] succeeding." *Id.* at 691.

In *Crane*, the Court's inquiry did not end with consideration of the defendant's interests. Rather, the Court sought to balance those interests against the state's interests in the evidentiary exclusion at issue; simplifying the Court's task was the fact that the state did not attempt to come forward with a justification for the questioned exclusion. *Crane*, 476 U.S. at 691.

Thus, *Crane* makes clear that a proper inquiry into the constitutionality of a court's decision to exclude evidence begins with considering the relevancy and cumulative nature of the excluded evidence, and the extent to which it was "central" or "indispensable" to the defense. Against this courts must balance the state's interests in enforcing the evidentiary rule on which the exclusion was based, in this case Michigan's rape shield statute.

When applying this delicate balance to the Michigan rape shield statute, we do not write on a blank slate. The Supreme Court has already considered that statute and, in doing so, reiterated these competing considerations. *Michigan v. Lucas*, 500 U.S. 145 (1991). In that case, the Court reviewed a holding of the Michigan Court of Appeals that the rape shield statute's "notice-and-hearing requirement is unconstitutional in all cases where it is used to preclude evidence of past sexual conduct between a rape victim and a criminal defendant." *Id.* at 148. Among other provisions, the statute requires the

accused to file "a written motion and offer of proof" within ten days of his arraignment if he plans to introduce evidence of the victim's past sexual conduct. Mich. Comp. Laws § 750.20j(2). In *Lucas*, the defendant failed to file the motion in a timely manner and the trial court excluded the evidence on that basis. The Supreme Court recognized that "the [rape shield] statute unquestionably implicates the Sixth Amendment" but also noted that placing limits on the ability to present a defense "does not necessarily render the statute unconstitutional." *Lucas*, 500 U.S. at 149. Quoting the same passage from *Van Arsdall*, 475 U.S. at 679, that it relied upon in *Crane*, *supra*, the Court recognized the wide latitude enjoyed by trial judges to limit the introduction of evidence. *Id.* In the Court's view, the Michigan rape shield law "represents a valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy." *Id.* at 150. Given these competing considerations, the Court framed the question posed to it as follows: "[W]hether the legitimate interests served by a notice requirement can ever justify precluding evidence of a prior sexual relationship between a rape victim and a criminal defendant." *Id.* at 151.

The Court answered in the affirmative and reversed the *per se* rule of the Michigan Court of Appeals. *Id.* at 152-53. Significantly in our view, it did not hold that preclusion of evidence for failure to comply with a notice provision is *always* appropriate. As in all of its cases balancing evidentiary considerations with the right to present a complete defense, the Court made clear that a case by case evaluation is required. Accordingly, it remanded for the Michigan courts to perform such a balancing and, in doing so, the Court "express[ed] no opinion as to whether or not preclusion was justified in this case." *Id.* at 153.

## IV.

With these precepts in mind, we turn to the facts before us. The writ may issue only when petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). And, as we stressed earlier in this opinion, our task is not to reach our own independent conclusion regarding the constitutional validity of the evidentiary decision to exclude evidence; rather, we must determine if the

last reasoned state court opinion was either contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1).[4]

The Michigan Court of Appeals affirmed the trial court's judgment. It acknowledged that evidentiary laws, including rape shield statutes, must give way when constitutional rights of the accused, specifically the Sixth Amendment right to confrontation, are implicated. *People v. Swathwood*, 2003 WL 1880143, at *1 (citing *People v. Hackett*, 365 N.W.2d 120, 124 (Mich. 1984) ("in certain limited situations, such evidence [of prior sexual conduct] may not only be relevant, but its admission may be required to preserve a defendant's constitutional right to confrontation")). Balanced against these constitutional considerations, the court of appeals observed that the Michigan Supreme Court has instructed trial courts to be "mindful of the significant legislative purposes underlying the rape-shield statute and should always favor exclusion of evidence of a complainant's sexual conduct where its exclusion would not unconstitutionally abridge the defendant's right to confrontation." *Id.* (quoting *People v. Adair*, 550 N.W.2d 505, 511 (Mich. 1996) (quoting *Hackett*, 365 N.W.2d at 125)) (quotation marks omitted). The balance struck by the court of appeals in this case is entirely consistent with the approach taken by the United States Supreme Court in *Lucas*. While the Michigan Court of Appeals did not cite federal constitutional law in its decision, its rendition of the appropriate legal analysis was not "contrary to" the "clearly established" federal law reflected in either *Crane* or *Lucas*.

That being the case, the writ may issue only if the court of appeals unreasonably applied that law. 28 U.S.C. § 2254(d)(1). We conclude that it did. With respect to the evidence regarding a "threesome" that included petitioner, Clark, and Bermudez, it reasoned as follows:

> [T]he complainant's willing participation in a threesome with Gagne and
> Bermudez is not probative of whether she consented to a threesome with

---

[4]The parties do not argue that the Michigan courts violated AEDPA by basing their decision "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

> Gagne and Swathwood on the night of the alleged offense. Notably, the threesome involving Bermudez occurred while the complainant and Gagne were still dating. The instant offense occurred after they had ended their relationship, and it involved Swathwood, not Bermudez. In light of the lack of similarity between the Bermudez threesome and the instant offense, we conclude that the trial court did not abuse its discretion in excluding the evidence.

*Swathwood*, at *2. The court of appeals also observed that the jury heard at length about the group sexual activity that followed the visit to Tony's Lounge, which included Clark and multiple partners. *Id.* at *3. Thus, "defendants presented evidence that the complainant was not averse to group sexual activity" and "the trial court did not abuse its discretion in excluding the evidence." *Id.* at *2-3. The court employed similar reasoning before reaching the same conclusion with respect to the invitation to Gagne's father to join in group sex. *Id*. at *3.

In our view, the court of appeals underestimated the vital nature of the disputed material, which we believe to be highly relevant, primarily as substantive evidence on the issue of whether Clark consented to the sexual activity the night of July 3, 2000.[5] The State argues otherwise in its brief to this court; inferring Clark's consent from these past incidents is

> the very inference that rape-shield laws are meant to avoid; that somehow consent to unrelated sexual activity is relevant to whether the victim consented to the charged offense. Like evidence of a defendant's prior criminal acts, governed by MRE and FRE 404(b), propensity evidence carries a significant danger of unfair inference and prejudice.

The State is correct that evidentiary rules generally disfavor showing a person's propensity for certain actions by introducing evidence of past similar acts, and it is further correct that in rape cases evidence regarding "unrelated sexual activity" is generally accepted as only minimally relevant to the question of consent. But rape shield laws, including Michigan's, almost universally except from this rule evidence regarding prior sexual activity *between the complainant and the defendant*, precisely

---

[5]It may also have impeachment purposes, but in our view, this purpose is less relevant than the substantive role this evidence would play, so we focus our analysis on the latter.

because that evidence carries heightened relevancy due to its increased similarity to the instance of the alleged rape. *See* Mich. Comp. Laws § 750.520j(1)(a); *see also* Fed. R. Evid. 412(b)(1)(B). In this case, these prior incidents have significant relevance not only because Gagne and Clark were involved in them, but also because they are both remarkably similar to the events that occurred the night of July 3.

Nor do we agree with the State that the excluded evidence was cumulative to the testimony already introduced regarding the Tony's Lounge incident. There are, of course, similarities between this evidence and the excluded evidence: if Swathwood's version of the Tony's Lounge incident is believed, then it demonstrates that Clark had, on at least one occasion, engaged in sexual activities of some variety with multiple partners over the course of one night; it also shows that she did so with Gagne and Swathwood. But we find the differences, which the prosecution took pains to highlight in closing argument, to be more significant. First, the evidence that Clark engaged in group sex during the Tony's Lounge incident is at best equivocal because Clark testified that she did not remember engaging in any sexual activities with Swathwood that night. She further testified that Gagne later told her that he had made up that part of the story. And although Swathwood testified that this had, in fact, occurred, it would have been obvious to the jury that he had reason to lie about this incident in order to show that Clark had engaged in these similar activities in the past. The prosecution realized that the jury might not believe Swathwood and argued in closing that Clark had not engaged in oral sex with Swathwood during the Tony's Lounge incident.

Second, even if the jury did believe that Clark and Swathwood had engaged in some sexual activity that night, there is no evidence at all that Clark engaged in that activity with multiple partners at once. At most the evidence shows only that, at some point during that night, she engaged in sexual intercourse with Gagne, and, at another point during the night, she engaged in oral sex with Swathwood, and did so in the presence of other people. This kind of activity differs substantially from the activity that occurred the night of July 3, in which three people engaged in simultaneous group sex. The prosecution, in discussing the Tony's Lounge incident, pointed out this difference

to the jury in closing: "Even if you believe, contrary to . . . what Ms. Clark told you, that she did engage in consen[s]ual sexual contact with Mr. Swathwood, the nature of the contact and relations here were 190 degrees [sic] different. That situation did not involve, ladies and gentlemen, two men."

Finally, even if the excluded evidence merely points to the same predilections shown by the Tony's Lounge incident, the entire trial hinged upon consent, so the *weight* of the evidence on this question is extremely important. This is evident from the closing arguments, in which the prosecutor repeatedly stressed the unlikeliness of Gagne's story, and told the the jury that his story was "much more consistent with the pornographic movie than real life." The defense's theory was that Clark consented to the activities of July 3, but it had only the Tony's Lounge incident as evidence that she may have done so. In our view, the exclusion of the evidence of the group sexual activity with Bermudez and the invitation to Gagne's father were indispensable to the jury's ability to assess the likelihood of this theory.

We cannot accurately portray the extent of Gagne's interest in presenting this evidence without reference to the lack of other evidence in this case. Other than the two defendants and the complainant, there were no eyewitnesses at all.[6] Nor did the physical evidence tend weigh in favor of one side or the other. In short, the excluded evidence was not just *relevant* to this case, it was in all likelihood the most relevant evidence regarding the sole contested issue at trial – an issue about which there was not much evidence in the first place. We believe it was indispensable to the defense's theory, a conclusion amply demonstrated by the consistent focus during closing arguments on what little evidence the court did admit regarding the likelihood (or unlikelihood) that Clark would have consented to the activity the night of July 3, 2000.

With this in mind, we turn to the Michigan Supreme Court for an indication of the State's interests in enforcing the rape shield statute. As the court of appeals

---

[6]Stout was present for at least some of the activity, but he testified that he was so intoxicated that he remembers nothing, a claim that is in line with Gagne, Swathwood, and Clark's accounts of Stout's general state of intoxication that night.

recognized, the Michigan Supreme Court has explained that those interests are two-fold: to encourage victims to report criminal activity and testify at trial; and to further the truth-finding process by preventing the admission of minimally relevant evidence that creates a significant risk of prejudice or confusion. *See Adair*, 550 N.W.2d at 509. We have acknowledged that there is always a real risk that allowing evidence concerning a complainant's sexual history will turn the case into a trial of the victim instead of the defendant. *Lewis v. Wilkinson*, 307 F.3d 413, 422 (6th Cir. 2002).

Nonetheless, we do not believe that admitting the evidence at issue in this case would overly frustrate the legitimate purposes of the rape shield statute. After all, the statute itself contains exceptions that demonstrate that the interests it usually serves must also accommodate the defendant's interest in the admission of evidence that is highly relevant, such as prior sexual conduct between the complainant and the defendant. While we are not reviewing the manner in which the Michigan courts applied the rape shield statute, which is a matter of state law, the fact that it contains this exception illustrates that the Michigan legislature recognized that the defendant has a heightened claim to the introduction of evidence of previous sexual contact with his accuser. This is not a case involving sex a decade before the subject incident. And what made the evidence even more central to petitioner's defense was the extraordinary nature of the events giving rise to the charge. The idea that someone could have consented to this sort of thing seems incredible absent proof that the person *had* consented to it before. Therein lies another similarity to *Crane*. In the underlying trial in *Crane* and in this case, the evidence that was admitted gave rise to a "question every rational juror needs answered[.]" 469 U.S. at 689. In *Crane*, that question was, "[i]f the defendant is innocent, why did he previously admit his guilt?" *Id.* Here the question jurors would need to have answered if Gagne was to be acquitted was, "how is it possible for anyone to consent to three-way sex of the kind described here?" In each case the exclusion of evidence "effectively disabled" the defendant from answering the question. *Id.* Moreover, in this case, the excluded evidence would not have been unfairly prejudicial given the sexually graphic testimony that had already been admitted as well as the testimony involving the use of crack cocaine and other narcotics. And as we pointed out

in *Lewis*, "the court could minimize any danger of undue prejudice by admitting the evidence with a cautionary instruction and strictly limiting the scope of cross-examination." *Id.*

Finally, we stress that our holding is fact-bound in the extreme: under the circumstances present here, the exclusion of evidence of the complainant's consensual three-way sex with the defendant only a month before the subject incident, in a three-way rape case in which extensive evidence of the victim's sexual conduct had already been admitted at trial, and where the question of guilt or innocence turned almost entirely on the credibility of the victim's testimony regarding consent, was an unreasonable application of the principles set forth by the Supreme Court in *Crane*. That case made clear that a defendant's constitutional right to present a defense, arising from the Due Process Clause of the Fourteenth Amendment, entails the right to put before the jury evidence which is highly relevant, non-cumulative, and indispensable to the central dispute in a criminal trial. This conclusion is also consistent with *Lucas*, a case in which the Court recognized that the Michigan rape shield statute implicates the Sixth Amendment rights of the accused and therefore its application must be carefully balanced against the legitimate interests served by the statute on a case by case basis. *Lucas*, 550 U.S. at 149. Reliance upon those legitimate interests in this case to exclude the incidents at issue runs contrary to the statute's exception that would allow a defendant – in this case petitioner – to present evidence of the victim's past sexual conduct with the actor. Mich. Comp. Laws § 750.520j. While the trial judge may exclude such evidence if its inflammatory or prejudicial nature outweighs its probative value, that discretion cannot trump the constitutional right of the accused to present evidence that is so "highly relevant" that its introduction, as in this case, is "indispensable" to the defense. *Crane*, 476 U.S. at 691. For these reasons, we hold that the Michigan Court of Appeals opinion constitutes an "unreasonable application of[] clearly established Federal law," 28 U.S.C. § 2254(d)(1), that deprived petitioner of his constitutional right to "a meaningful opportunity to present a complete defense" as articulated by the Supreme Court in *Crane*. The writ shall issue.

## V.

The judgment of the district court is **affirmed**.

---

**CONCURRENCE**

---

KETHLEDGE, Circuit Judge, concurring.  It is hard for a court to invalidate a provision that does not even apply to the case at hand.  It is harder still to invalidate a whole gaggle of provisions that actually support the result reached in the case.  Yet that, according to the rhetoric in support of the State's petition for rehearing, is the feat we have managed here.  I think the rhetoric is seriously overblown.

We are told, in support of rehearing, that our decision effectively invalidates every rape-shield law in this circuit.  That argument cannot be squared with the text of those laws.  The core of any rape-shield law is its proscription against evidence of past sexual activity by the victim.  But every one of those laws—or at least every one we are said to have vaporized here—contains an exception for evidence of the victim's prior sexual activity *with the defendant*.  And that is exactly the kind of evidence that we hold should have been admitted in this case.  Michigan's statute excepts from its proscription "[e]vidence of the victim's past sexual conduct with the actor."  Mich. Comp. Laws § 750.520j(1)(a).  Ohio's statute does the same.  *See* Ohio Rev. Code § 2907.02(D) (excepting evidence of "the victim's past sexual activity with the offender").  So does the Tennessee rule.  *See* Tenn. R. Evid. 412(c)(3) (allowing admission of evidence of "sexual behavior . . . with the accused, on the issue of consent").  The federal rule affirmatively provides that "evidence of specific instances of sexual behavior" between the alleged victim and defendant "*is* admissible," if offered to prove consent and otherwise admissible under the rules.  Fed. R. Evid. 412(b)(1)(B) (emphasis added).  Kentucky's rule is identical to the federal one.  *See* Ky. R. Evid. 412(b)(1)(B).  I am of course mindful that we apply only constitutional rules, not statutory ones, on habeas review.  But rhetorically speaking, our decision applies these laws, rather than abrogates them.

Equally misdirected is the claim that we have trampled upon the policies that animate these laws.  As Judge Norris's opinion carefully explains, we hold that, under

the rather extraordinary facts presented here, certain evidence of the complainant's prior consensual sex with the defendant was indispensable to his ability to present a complete defense at trial. The argument now is that, in deeming that evidence indispensable, we have indulged in outdated inferences whose eradication was a principal aim of these laws. But the argument again is let down by the laws. Every one of these laws is supported by significant state interests. (The extent to which those interests are implicated in a particular case, as discussed below, is another matter.) And yet, notwithstanding those important interests, every one of these laws contains an exception for evidence of consensual sex with the defendant. These laws must infer something very important about such evidence; and they do so especially in cases—like this one—where consent itself is the issue. The inference is that, in some (and perhaps most) cases, evidence of past consensual sex with the defendant is highly relevant to the issue of consent in the incident giving rise to the charge. We merely conclude that this is such a case.

Notable as well is that the caselaw in Michigan, and the terms of the federal and Tennessee rules, expressly wave off the rape-shield proscription as to "evidence the exclusion of which would violate the constitutional rights of the defendant." Fed. R. Evid. 412(b)(1)(C); *see also People v. Hackett*, 365 N.W.2d 120, 124 (Mich. 1984) (recognizing that, in some situations, admission of evidence relating to the victim's sexual conduct "may be required to preserve a defendant's constitutional right to confrontation"); *People v. Adair*, 550 N.W.2d 505, 511 (Mich. 1996) (rejecting a construction of Michigan's rape-shield statute that would have "run[] the risk of violating a defendant's Sixth Amendment constitutional right to confrontation"); Tenn. R. Evid. 412(c)(1). We do not, of course, look to these rules in determining whether there was a violation of clearly established federal constitutional law. But these provisions do show that the rules' drafters knew very well that they were operating close to the constitutional line. That the rules' application might cross it, on occasion, should surprise no one.

I also think the rehearing petition overstates the breadth of our holding in this case. We do not hold that the Supreme Court's decision in *Crane v. Kentucky*, 476 U.S. 683 (1986), clearly establishes a rape defendant's constitutional right to admit evidence of the victim's prior consensual activity with the defendant (much less with persons other than the defendant). What we do say, as a starting point for the analysis, is that *Crane* clearly establishes that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Id.* at 690 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). The State of Ohio, as amicus, says this rule is stated at too high a level of generality to support habeas relief here. That point is a serious one; the more general a rule, the more difficult it is to say that the state court unreasonably applied the rule to a particular set of facts. With generality often comes discretion. But I think the facts of *Crane* and those of this case converge at a level closer to the ground than the State realizes.

*Crane* requires consideration of two factors in determining whether the exclusion of evidence denies the defendant a meaningful right to present a complete defense. The first is the extent to which the evidence was "central to the defendant's claim of innocence." *Id.* The second is the extent to which its exclusion was supported by a "valid state justification[.]" *Id.* In *Crane*, the defendant was convicted of murder. He was 16 years old at the time of the crime. There was "no physical evidence to link him" to the murder. *Id.* at 691. The State's evidence of guilt was primarily Crane's own confession. Crane sought to discredit the confession with testimony that "he had been detained in a windowless room for a protracted period of time, that he had been surrounded by as many as six police officers during the interrogation, that he had repeatedly requested and been denied permission to telephone his mother, and that he had been badgered into making a false confession." *Id.* at 685. That evidence, the Supreme Court said, was "highly relevant" to the reliability and credibility of the confession, which again was the State's primary evidence of guilt. *Id.* at 691. And the Court saw no justification for excluding the evidence under the circumstances presented there. The Court did not "pass on the strength or merits" of Crane's defense. *Id.* But

it held, unanimously, that the exclusion of Crane's testimony violated his right to present a complete defense.

The analysis flows in the same channels here. First, the excluded evidence was "central to the defendant's claim of innocence." *Id.* at 690. Gagne was convicted of forcing Clark to engage in an outlandish sexual encounter with himself and another man. The events making up that encounter were largely undisputed; what was disputed was whether Clark consented. There was little if any physical evidence of non-consent. The State's primary evidence of guilt, rather, was Clark's own testimony that she did not consent. Gagne sought to discredit that testimony with evidence that—only one month before the subject incident—Clark had voluntarily engaged in three-way sex with Gagne and another man, and that she had suggested the same thing on another occasion. That evidence would have included testimony not only from Gagne, but also from Ruben Bermudez, the other participant in the three-way the month before, who according to Gagne's lawyer was prepared to testify at trial. *See* 1/2/01 Hearing Tr. 18-19. But the trial court excluded all of that testimony. That exclusion was affirmed by the state court of appeals, which held—remarkably—that the excluded testimony was not even relevant to the case.

That the excluded evidence was highly relevant can be inferred, as discussed above, from the rape-shield statutes themselves. Moreover, as Judge Norris explains, in both this case and *Crane* the excluded evidence, if credited, answers a question that, if left unanswered, leads directly to conviction. *See* Maj. Op. at 15-16.

The State says the trial court's admission of evidence of another sexual encounter—the so-called Tony's Lounge incident, which involved five people—made the three-way evidence only marginal, rather than central, to Gagne's defense. But the prosecution itself did a credible job of explaining, in closing argument, why the Tony's Lounge evidence did very little to answer the question described above. I think that Judge Norris's opinion convincingly finishes the job.

What *is* significant is the effect of the Tony's Lounge evidence upon the State's interest in excluding the Gagne and Bermudez three-way testimony. This, in my view,

is where the bottom falls out of the State's argument on appeal. As an initial matter, this case only weakly implicates the interests protected by Michigan's rape-shield statute, since the statute's terms did not even bar the excluded testimony, but instead left its admission to the discretion of the Ingham County Circuit Judge. *See* Mich. Comp. Laws § 750.520j(1)(a). And it is hard to see what was left of those interests, such as they were in this case, given the evidence that *was* admitted at trial. That evidence included that, during the Tony's Lounge incident, Clark had engaged in oral sex with Swathwood shortly after intercourse with Gagne, and that she had engaged in consensual oral sex with Gagne minutes before the very incident for which he was convicted (and moreover that she had drunk a pint of vodka and nine or so beers and smoked crack in the hours before the incident). I entirely agree that Michigan's rape-shield law protects important state interests in the vast majority of cases in which it is implicated. But I submit that, under the circumstances of this trial, there was virtually nothing left of those interests to protect.

So here, as in *Crane*, the prosecution's case hinged on a single account of what happened during the underlying incident. In each case, the nature of that account—a confession there, and the outlandish conduct alleged to have been coerced here—tended to make the account especially persuasive to a jury. In each case, the trial court excluded highly relevant evidence that, if credited, could have undermined the account upon which the State relied. And in each case the State's interest in excluding that evidence was negligible.

These parallels emerge, admittedly, only after close analysis. But I think they are clear enough to render the state court's decision unreasonable within the meaning of the habeas statute. (It bears mention that two Justices of the Michigan Supreme Court voted to reverse the decision summarily, and that Justice Markman voted to hear the case. *See* 673 N.W.2d 755 (Mich. 2003) (unpublished table disposition).) The exclusion of the three-way evidence clearly violated Gagne's Sixth Amendment and procedural due process rights. He should have been able to present that evidence to a jury before ultimately being sentenced to a prison term of up to 45 years.

My purpose in reciting this evidence, however, is not to explain what Judge Norris has already explained in his nuanced opinion. And I readily admit that reasonable people, including the respected Chief Judge of our court, can disagree with my conclusion in this case. Nor do I mean to "pass on the strength or merits" of Gagne's defense. *Crane,* 476 U.S. at 691. I think those merits should have been left to the jury; and otherwise I do not hold a torch for anyone involved in the underlying events of this case.

My purpose, instead, is to emphasize the limited nature of our holding in this case. *See also* Maj. Op. at 16-17. With respect, I do not think that holding has nearly the jurisprudential consequences that Michigan and the amici States seem to think it has.

For these reasons, I continue to concur fully in Judge Norris's opinion.

---

**DISSENT**

---

ALICE M. BATCHELDER, Chief Judge, dissenting.  Some 35 years ago, the
Michigan state legislature determined that a criminal defendant accused of rape may not
introduce evidence about the victim's past sexual behavior, because the victim's past
willingness is not relevant to the question of present consent.  The majority here
disagrees with that legislative determination and concludes that evidence of the victim's
promiscuity or previous willingness to engage in somewhat similar sex acts was not only
relevant but was "indispensable" and "the most relevant evidence."  Moreover, because
this appeal arises in the context of a habeas proceeding, the majority ultimately holds
that the rape defendant has a "constitutionally protected" and "clearly established" right
to introduce this evidence.  In so holding, the majority effectively abrogates every rape-
shield statute in this circuit.[1]  I do not believe that there is any such constitutional right
to present evidence of a rape victim's promiscuity or past willingness to engage in sex
acts, nor do I believe that the majority is justified in its condemnation of the rape-shield
concept.  I dissent.

**A.**

In concluding its analysis, and justifying its grant of habeas relief, the majority
cites *Crane v. Kentucky*, 476 U.S. 683 (1986), as the "clearly established law" that the
Michigan Court of Appeals "unreasonably applied."  *See* Maj. Op. at 17 ("We therefore
conclude that the state appellate court's determination on this issue was an unreasonable
application of the principles set forth by the Supreme Court in *Crane*.").  The majority
offers the following exposition of those "principles":

> *Crane* <u>makes clear</u> that a proper inquiry into the <u>constitutionality</u> of a
> court's decision to exclude evidence begins with considering the

---

[1]*See* Fed. R. Evid. 412 (108 Stat. 1919, eff. Sept. 13, 1994); Tenn. R. Evid. 412 (adopted July
1, 1991, to replace T.C.A. § 40-17-119); Ky. R. Evid. (1990 c 88 § 22, eff. Mar. 16, 1990); Ohio Rev.
Code § 2907.02(D) (1975 S 144, eff. Aug. 27, 1975); Mich. Comp. L. § 750.520j (P.A. 1974, No. 266 § 1,
eff. Apr. 1, 1975).

>    relevancy and cumulative nature of the excluded evidence, and the extent
>    to which it was 'central' or 'indispensable' to the defense.  Against this
>    courts must balance the state's interests in enforcing the evidentiary rule
>    on which the exclusion was based, in this case Michigan's rape shield
>    statute.

Maj. Op. at 9 (underlining added) (citing *Crane*, 476 U.S. at 691).  So, according to the majority, *Crane* stands for the clear proposition that if a defendant accused of rape can show that evidence of the rape victim's promiscuity or prior willingness to perform sex acts is "highly relevant, non-cumulative, and indispensable to the central dispute in a criminal trial," then that defendant has a *constitutional right* to "put [that evidence] before the jury."  Maj. Op. at 16.

I cannot accept this proposition.  Foremost, I do not agree with its constitutional premise.  That is, in light of *Michigan v. Lucas*, 500 U.S. 145 (1991), I do not believe that there is any such constitutional right.  But, even if I am mistaken in my reading of *Lucas*, I cannot agree that this proposition was — or, indeed, is now — "clearly established" as Supreme Court precedent, and I do not agree that such a liberal extension of *Crane* is justified (or justifiable).  Moreover, I cannot agree that the Michigan Court of Appeals's application of these governing principles (such as they are) was "objectively unreasonable."  Finally, I am simply unwilling to sanction the inevitable, albeit unacknowledged, consequence of this decision — that rape-shield statutes are *ipso facto* unconstitutional, inasmuch as their very purpose is to exclude, on policy grounds, evidence that is almost always "highly relevant, non-cumulative, and indispensable to the central dispute in a criminal trial."

**1.**

In *Lucas*, 500 U.S. at 147, the Michigan prosecutor charged Nolan Lucas with criminal sexual conduct based on his ex-girlfriend's accusation that he forced her to his apartment at knife point and forced her to perform various sex acts against her will.  *Id.* at 147.  Lucas and the ex-girlfriend had ended a six-to-seven month relationship just two weeks earlier and Lucas insisted that the entire episode was consensual, that he had not used a knife or any other force.  *See Michigan v. Lucas*, 408 N.W.2d 431, 431-32 (Mich.

App. 1987). At trial, the ex-girlfriend claimed rape and Lucas claimed consent. *See Michigan v. Lucas*, 469 N.W.2d 435, 436 (Mich. App. 1991) ("Virtually all of the evidence in this case consisted of complainant's word against the word of defendant.").

At trial, Lucas's counsel sought to introduce testimony regarding the couple's relationship — specifically, their sexual history — as evidence of consent, but the state objected on the basis that defense counsel had not given prior notice of its intent to use that evidence, as was required by the Michigan rape-shield statute, M.C.L. §750.520j. *See Lucas*, 500 U.S. at 147. The trial court agreed that Lucas's counsel had failed to comply with the notice provision of the rape-shield statute and refused to admit the evidence. *Id.* at 148.

After being convicted and sentenced, Lucas appealed. *Id.* The Michigan Court of Appeals vacated the conviction, holding "that the [Michigan rape-shield statute]'s notice-and-hearing requirement is unconstitutional in all cases where it is used to preclude evidence of past sexual conduct between a rape victim and a criminal defendant." *Id.* The United State Supreme Court granted certiorari to decide this constitutional question and ultimately concluded:

> [T]he Michigan Court of Appeals erred in adopting a *per se* rule that Michigan's notice-and-hearing requirement violates the Sixth Amendment in all cases where it is used to preclude evidence of past sexual conduct between a rape victim and a defendant. The Sixth Amendment is not so rigid. The notice-and-hearing requirement serves legitimate state interests in protecting against surprise, harassment, and undue delay. Failure to comply with this requirement may in some cases justify even the severe sanction of preclusion.

*Id.* at 152-53. The Supreme Court vacated the judgment and remanded the case, stating:

> We leave it to the Michigan courts to address in the first instance whether Michigan's rape-shield statute authorizes preclusion and whether, on the facts of this case, preclusion violated Lucas' rights under the Sixth Amendment.

*Id.* at 153. So, the Supreme Court expressly did not decide the preclusion question, which is the question before us here. And, the inescapable consequence of this *non-*

decision — the avoidance of this particular question — is that the Court has not articulated any "clearly established" law on this issue.

In the present case, however, the Michigan courts did consider whether Michigan's rape-shield statute authorizes preclusion and determined, on the facts of *this* case, that preclusion of certain testimony concerning Ms. Clark's alleged prior sexual activities did not violate defendant Gagne's rights under the Sixth Amendment. Because the *Lucas* Court had left this issue unresolved, *Lucas* offers little direct guidance on this issue (i.e., *Lucas* did not "clearly establish" any law on this particular issue), but it certainly offers some guidance, the most telling of which comes from what it did <u>not</u> hold.

The *Lucas* Court did not hold what the majority holds today — that a defendant has a constitutional right to put evidence before the jury because the evidence was highly relevant, non-cumulative, and indispensable to the central dispute. If the evidence at issue in the present case was highly relevant, non-cumulative, and indispensable to the central dispute, then the evidence in *Lucas* was equally or more so. In the present case, the evidence concerned the victim's alleged willingness to participate in a particular sexual practice on at least two prior occasions; in *Lucas*, the evidence concerned the victim's six-to-seven month relationship with the defendant, the emotional, physical, and sexual nature of their relationship, and the patterns and practices incident thereto. If the former is "highly relevant," then so must be the latter. In the present case, the court excluded two incidents of prior sexual activities, but admitted testimony about three others; in *Lucas*, the court excluded any reference whatsoever to the prior sexual relationship. If the former is "non-cumulative," so must be the latter. And, finally, the central issue in the present case was the defendant's asserted defense of consent, which was also the central issue in *Lucas*. If evidence concerning consent in the former is "indispensable to the central dispute," so it must be in the latter.

So, it bears emphasizing that even though the evidence in *Lucas* was clearly "highly relevant, non-cumulative, and indispensable to the central dispute in a criminal trial," *see* Maj. Op. at 16, the *Lucas* Court <u>did not hold</u> — and did not even suggest —

that the defendant therefore had some over-arching *constitutional right* to "put [that evidence] before the jury," *see* Maj. Op. at 16. In fact, the *Lucas* Court implicitly rejected any such right, holding instead that the defendant's "[f]ailure to comply with [the notice] requirement may in some cases justify even the severe sanction of preclu[ding]" such highly relevant, non-cumulative, and indispensable evidence. *See Lucas*, 500 U.S. at 153. It is perhaps just as important that the *Lucas* Court expressly left it to the Michigan courts to decide "whether, on the facts of this case, preclusion [of the propensity evidence] violated Lucas' rights under the Sixth Amendment." *See id.* The majority notes that "rape shield laws, including Michigan's, almost universally except from this rule evidence regarding prior sexual activity *between the complainant and the defendant*, precisely because that evidence carries heightened relevancy due to its increased similarity to the instance of the alleged rape." Maj. Op. at 13 (emphasis in original). But in *Lucas*, it was exactly that type of sexual-history evidence that had been precluded.

So, the clear implication of *Lucas* is that the trial court can, without running afoul of the Constitution, exclude highly relevant, non-cumulative, and indispensable evidence from a criminal defendant's trial. That is, *Lucas* clearly demonstrates that a court *can* constitutionally exclude such evidence on the basis that the defendant's attorney failed to comply with the statute's notice requirement. Therefore, the right (such as it is) to put that evidence before the jury is not grounded in the Constitution, but is instead grounded in state law or the state's proper application of that law. *Cf. Dist. Atty.'s Office for the Third Judicial Dist. v. Osborne*, 557 U.S. --, 129 S. Ct. 2308, 2320 (2009) (holding that there is no stand-alone constitutional right to access evidence for purposes of DNA testing, there is at most a constitutional right to the proper application of a state-created right).

The majority's proposition cannot survive *Lucas*. While the Supreme Court has left its Sixth Amendment analysis unarticulated post-*Lucas*, it is evident from the foregoing that whatever the proper analysis may be, the majority's (unprecedented) proposition does not conform to it.

**2.**

The majority's holding is premised on *Crane v. Kentucky*, 476 U.S. 683, 684 (1986), a case in which a 16-year-old defendant was implicated in the murder of a liquor store clerk and signed a confession at the police station. At the boy's trial, the court refused to admit evidence about the circumstances surrounding his confession — "that he had been detained in a windowless room for a protracted period of time . . . surrounded by as many as six police officers. . . , that he had repeatedly requested and been denied permission to telephone his mother, and that he had been badgered into making a false confession." *Id*. at 685. The jury convicted him of the murder and the court sentenced him to 40 years in prison. *Id*. On appeal to the Supreme Court, the Court reversed the conviction on constitutional grounds. *Id*. at 687.

The Court explained that, while a pre-trial confession is "not conclusive of guilt," it certainly changes the complexion of the defense and invariably raises "the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" *Id*. at 689. Thus, the Court explained, such "a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility." *Id*.

> This simple insight is reflected in a federal statute, 18 U.S.C. § 3501(a), the Federal Rules of Evidence, Fed. Rule Evid. 104(e), and the statutory and decisional law of virtually every State in the Nation [citations omitted]. We recognize, of course, that under our federal system even a consensus as broad as this one is not inevitably congruent with the dictates of the Constitution. We acknowledge also our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts. In any given criminal case the trial judge is called upon to make dozens, sometimes hundreds, of decisions concerning the admissibility of evidence. As we reaffirmed earlier this Term, the Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive, only marginally relevant[,] or poses an undue risk of harassment, prejudice, or confusion of the issues. Moreover, we have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability — even if the defendant would prefer to see that evidence admitted. Nonetheless, without signaling any diminution in the respect

> traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures, we have little trouble concluding *on the facts of this case that the blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial*.

*Id*. at 689-90 (citations, quotation and editorial marks omitted; emphasis added).

Thus, the clear proposition for which *Crane* stands is that when a criminal defendant, having signed a confession, nonetheless proceeds to trial, the Constitution guarantees that defendant the right to present evidence (i.e., the right to be heard) about the circumstances surrounding the confession, so that he may present a complete defense by challenging the credibility of that pre-trial confession. A broader application is not evident (or inevitable) from the text of the *Crane* opinion.

In *Holmes v. South Carolina*, 547 U.S. 319 (2006) — a case the majority cites in support of *Crane* — the Supreme Court characterized *Crane* as a case about an "arbitrary" rule:

> Another arbitrary rule was held unconstitutional in *Crane v. Kentucky*, [476 U.S. 683 (1986)]. There, the defendant was prevented from attempting to show at trial that his confession was unreliable because of the circumstances under which it was obtained, and neither the [Kentucky] State Supreme Court nor the prosecution 'advanced any rational justification for the wholesale exclusion of this body of potentially exculpatory evidence.' *Id*. at 691.

*Holmes*, 547 U.S. at 326. It is noteworthy that, although it cited *Holmes*, the majority here did not hold that the Michigan rape-shield statute is "arbitrary" or that the Michigan Court of Appeals failed to "advance[] any rational justification" for its exclusion of the sexual propensity evidence.

The majority cites *Crane* as the "clearly established law" that the Michigan Court of Appeals "unreasonably applied" in this case. *See* Maj. Op. at 17 ("We therefore conclude that the state appellate court's determination on this issue was an unreasonable application of the principles set forth by the Supreme Court in *Crane*."). That is, the majority views *Crane* — a decision that upheld a criminal defendant's constitutional

right to introduce evidence about the circumstances surrounding *his own* (allegedly coerced) pre-trial confession — as the "clearly established" or governing law on the constitutionality of a criminal defendant's right to introduce evidence about the *victim*'s prior willingness to participate in certain private, potentially humiliating, sex acts, based on the defendant's theory that her previous willingness would be indicative of her current willingness.

I do not agree that the majority's rendition of *Crane* is or was "clearly established." In my view, the majority has extended *Crane* well beyond any reading or application justified by the language of the opinion or any subsequent case. It is unfair to fault the Michigan Court of Appeals, as the majority does, for failing to anticipate this novel extension of *Crane*.

**3.**

The majority's approach does not comply with the limitations of AEDPA. Under AEDPA, the phrase "unreasonable application of" Supreme Court precedent means that the state court "identifie[d] the correct governing legal principle from [Supreme Court] decisions but unreasonably applie[d] that principle to the facts" of the case. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). But, "a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (quoting *Williams*, 529 U.S. at 411). Even "a *firm conviction* that the state court was erroneous" is not enough. *Id*. at 75 (quotation marks omitted; emphasis added). Rather, "[t]he state court's application of clearly established law must be *objectively unreasonable*." *Id*. at 76 (emphasis added); *see also Wright v. Van Patten*, 552 U.S. 120, 128 S. Ct. 743, 747 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner]'s favor, it cannot be said that the state court unreasonably applied clearly established Federal law." (quotation marks and citations omitted)).

A review of the Michigan Court of Appeals' decision reveals that its application, far from being "objectively unreasonable," was eminently reasonable. The court explained its approach:

> Evidence of specific instances of a victim's past sexual conduct with others is generally legally irrelevant and inadmissible under the rape-shield statute, M.C.L. § 750.520j. In certain limited situations, evidence that does not come within the specific exceptions of the statute may be relevant and its admission required to preserve a criminal defendant's Sixth Amendment right of confrontation. . . .
>
> Inquiries into sex histories, even when minimally relevant, carry a danger of unfairly prejudicing and misleading the jury. Application of the rape-shield statute must be done on a case-by-case basis, and the balance between the rights of the victim and the defendant must be weighed anew in each case. In exercising its discretion, the trial court should be mindful of the significant legislative purposes underlying the rape-shield statute and should always favor exclusion of evidence of a complainant's sexual conduct where its exclusion would not unconstitutionally abridge the defendant's right to confrontation.

*Michigan v. Swathwood*, No. 235540 & 235541, 2003 WL 1880143, *1 (Mich. App. Apr. 15, 2003) (citations and quotations marks omitted). The court considered the evidence and, concluding that evidence of Ms. Clark's propensity to participate in certain sex acts was not probative of whether she consented to the acts complained of in the present case, affirmed the trial court. *Id*. at *2-4.

I cannot agree that the Michigan Court of Appeals's application of the governing principles was "objectively unreasonable." It appears to me that the majority does not dispute the state court's application of the law so much as it simply disagrees with either the Michigan legislature's policy determination about the relevance of this propensity evidence or with the state court's measure of the probity or relevance of this evidence. Neither is a proper basis for habeas relief.

**4.**

It is commonly understood that the uncorroborated testimony of a rape victim is sufficient to support a conviction.  *See Tibbs v. Florida*, 457 U.S. 31, 45 n.21 (1982); *Brown v. Davis*, 752 F.2d 1142, 1144 (6th Cir. 1985) (holding that the testimony of a single, uncorroborated rape victim is sufficient to support conviction); *Michigan v. Whittaker*, 2007 WL 914342, *5 (Mich. App. Mar. 27, 2007) ("Indeed, in cases of sexual assault, a conviction may 'be based upon the uncorroborated testimony of the woman assaulted.'") (quoting *Michigan v. Miller*, 55 NW 675, 676 (Mich. 1893)); M.C.L. §750.520h ("The testimony of a victim need not be corroborated in [rape and sexual assault] prosecutions under sections 520b to 520g.").  But, the majority is not so easily persuaded.

> The defense's theory was that Clark consented to the activities of July 3, but it had only the Tony's Lounge incident as evidence that she may have done so.  In our view, the exclusion of the evidence of the group sexual activity with Bermudez and the invitation to Gagne's father were indispensable to the jury's ability to assess the likelihood of this theory.  We cannot accurately portray the extent of Gagne's interest in presenting this evidence without reference to the lack of other evidence in this case.  Other than the two defendants and the complainant, there were no eyewitnesses at all.  Nor did the physical evidence tend weigh in favor of one side or the other.  In short, the excluded evidence was not just *relevant* to this case, it was in all likelihood the most relevant evidence regarding the sole contested issue at trial — an issue about which there was not much evidence in the first place.  We believe it was indispensable to the defense's theory . . . .

Maj. Op. at 14-15 (paragraph break and footnote omitted).

First, let's be very clear about what the majority means when it says "evidence of the group sexual activity with Bermudez and the invitation to Gagne's father."  This "evidence" is simply Gagne's uncorroborated testimony about these alleged incidents.  No one contends that either Bermudez or Gagne's father was prepared to testify about these incidents, or that there was any other "proof."  And Clark was prepared to refute these accusations, had Gagne been allowed to raise them.

And, it bears emphasizing that the defense did *not* have "only the Tony's Lounge incident as evidence" that "Clark consented to the activities of July 3"; the defense had testimony by both Gagne and Swathwood — which is twice as much testimony as a rape defendant would typically have — and an opportunity to cross-examine the sole complainant, Pamela Clark. Moreover, the "lack of other evidence" did not hinder Gagne's defense; if anything it hindered the prosecution, whose burden it was to prove the offense beyond a reasonable doubt.

So, the majority is really saying that despite the absence of physical evidence, and despite Gagne's and Swathwood's consistent testimony that Clark consented, and despite their consistent testimony about the Tony's Lounge incident, and despite defense counsel's opportunity to cross-examine Clark at length — Gagne's self-serving and unverifiable testimony about those two other past, unrelated incidents of sexual debauchery on the part of his accuser, Pamela Clark, was "*indispensable* to the jury's ability to assess the likelihood" that she had consented to the far more violent and humiliating form of sexual debauchery with Gagne and Swathwood on the night in question. The majority contends: "the excluded evidence was not just *relevant* to this case, it was in all likelihood the most relevant evidence regarding the sole contested issue at trial," consent.

So, the majority's position is that "the most relevant evidence" in a rape trial, the "indispensable" evidence, is the perpetrator's testimony about the victim's promiscuity or prior sex acts. And this, according to the majority, is because a rape defendant has a constitutional right to prove present consent by producing evidence of past willingness, at least insofar as the defendant can characterize that evidence as highly relevant, non-cumulative, and central to the dispute.

I disagree and find that I am not alone. In *Sandoval v. Acevedo*, 996 F.2d 145, 147-48 (7th Cir. 1993), the Seventh Circuit decided a case in which the defendant — accused of forcibly sodomizing his ex-girlfriend — sought to introduce testimony by other men that she had enjoyed anal intercourse with them in the past, thus demonstrating her propensity for it. The court explained:

> The essential insight behind the rape shield statute is that in an age of post-Victorian sexual practice, in which most unmarried young women are sexually active, the fact that a woman has voluntarily engaged in a particular sexual activity on previous occasions does not provide appreciable support for an inference that she consented to engage in this activity with the defendant on the occasion on which she claims that she was raped. And allowing defense counsel to spread the details of a woman's sex life on the public record not only causes embarrassment to the woman but by doing so makes it less likely that victims of rape will press charges.

*Id*. at 149. The Seventh Circuit continued:

> The fact that [she] had had pleasurable anal intercourse with another man on another occasion would not show that she would have enjoyed having it with Sandoval on an occasion when he was enraged and wanted by penetrating her anally to humiliate and, quite possibly, physically hurt her. Indeed, by that logic rape shield laws would be unconstitutional to the core because their central aim is to prevent the drawing of an inference of consent from previous consensual intercourse with other men.

*Id*. at 151.

> [E]ven without a rape shield law it is doubtful that testimony that she had enjoyed it with another man would be admissible, for it doesn't, or at least shouldn't, require a rape shield law to show that consent to sex with X on one occasion is not good evidence of consent to sex with Y on another.

*Id*. To extend this basic reasoning to the present case: it shouldn't require a rape shield law to show that consent to sex with X and Y on one occasion is not good evidence of consent to sex with X and Z on another. But, as so many states have discovered, it *does* require a rape-shield law, because too many people — like the majority here — succumb to the "propensity evidence" problem.

There is, to be sure, a commonplace assumption behind propensity evidence: *If she did it before, she's more likely to have done it again. Cf.*, *e.g.*, *Old Chief v. United States*, 519 U.S. 172, 181 (1997); Fed. R. Evid. 404(b). And there is a peculiar aspect to propensity evidence in rape cases, in which evidence of the *victim's* sexual

predilections — e.g., a propensity for sexual willingness — has historically been considered indicative of whether the victim consented to the incident in question. *See* Fed. R. Evid. 412. And this is an assumption that the Michigan legislature (like many others across the country) was attempting to overcome by enacting its rape shield statute.

The Michigan legislature has declared such evidence generally inadmissible as a matter of public policy: that rape victims should be encouraged to report and prosecute rapes without fear that private, potentially embarrassing, incidents from their past will become the centerpiece of the ensuing trial. The majority disagrees and holds that the rape-shield statute is no bar to evidence of a rape victim's promiscuity or prior willingness to engage in sexual debauchery, if that evidence is "highly relevant, non-cumulative, and indispensable to the central dispute in a criminal trial."

But, as the Seventh Circuit stated so cogently, "by that logic rape shield laws would be unconstitutional to the core," *see Sandoval*, 996 F.2d at 151, inasmuch as the very purpose of a rape-shield statute is to exclude, on policy grounds, evidence that is almost always highly relevant, non-cumulative, and indispensable to the central dispute in a criminal trial. If the majority wants to hold that rape-shield statutes are unconstitutional, it should do so forthrightly. At least, that way, we would have the issue front and center, with an opportunity for debate and dissent.

**B.**

I cannot agree that the Michigan Court of Appeals unreasonably applied any clearly established law, and I cannot join the majority opinion which, in effect, invalidates all rape shield laws as violative of the Sixth Amendment. Therefore, I respectfully dissent. I would reverse the district court's judgment and deny the petitioner's request for habeas relief.